# IN THE SUPREME COURT OF CALIFORNIA

LOS ANGELES COUNTY EMPLOYEES RETIREMENT
ASSOCIATION,
Plaintiff and Appellant,

v.

COUNTY OF LOS ANGELES et al.,
Defendants and Respondents.

S286264

Second Appellate District, Division Seven
B326977

Los Angeles County Superior Court
21STCP03475

_____

August 3, 2026

Justice Corrigan authored the opinion of the Court, in which
Chief Justice Guerrero and Justices Kruger and Simons*
concurred.

Justice Groban filed a dissenting opinion, in which Justices Liu
and Evans concurred.

_____

_____
* Associate Justice of the Court of Appeal, First Appellate
District, Division Five, assigned by the Chief Justice pursuant
to article VI, section 6 of the California Constitution.

LOS ANGELES COUNTY EMPLOYEES RETIREMENT
ASSOCIATION v. COUNTY OF LOS ANGELES

S286264


Opinion of the Court by Corrigan, J.


This case presents two related issues about the job classification and salary-setting authority granted to public pension boards and county boards of supervisors.

The first issue concerns power granted by the California Constitution giving public pension retirement boards "plenary authority and fiduciary responsibility for investment of moneys and administration of the system." (Cal. Const., art. XVI, § 17 (section 17).) The question involves the scope of authority granted. Specifically, does that constitutional authority over the management of fund assets and delivery of benefits extend more broadly to empower a retirement board to unilaterally set civil service classification and salary levels for system employees?

The second issue concerns the statutory authority of county governments and retirement boards operating under the 1937 County Employees Retirement Law. (CERL; Gov. Code, § 31450 et seq.)[1] That inquiry addresses whether, apart from the Constitution, the CERL statutes separately grant county retirement boards the power to set classification and salary levels and compel county boards of supervisors to implement

---

[1] All undesignated statutory references are to the Government Code.

1

these retirement board decisions in the county's salary ordinance.

The Los Angeles County Employees Retirement Association (LACERA) is a retirement system operating under the CERL statutory scheme. It petitioned for a writ of mandate compelling the County of Los Angeles (County) to implement its classification and salary decisions for certain staff positions. The trial court denied the writ but the Court of Appeal reversed, concluding retirement boards have the final authority to decide classification and salary setting. In so holding, the court disagreed with *Westly v. Board of Administration* (2003) 105 Cal.App.4th 1095, 1110 (*Westly*), which had construed the constitutional authority of retirement boards more narrowly.

We conclude *Westly*'s narrower construction was correct. Considered as a whole, the relevant constitutional and statutory provisions create a system of cooperative responsibility between retirement boards and governing bodies on issues related to employee classification and compensation. There is no indication that either the Legislature or the voters intended to upset that balance by leaving these decisions to retirement boards alone. We also reject the related argument that CERL imposes a mandatory duty on counties to automatically implement retirement board decisions on classification and salary setting. Instead, we hold that, while CERL grants retirement boards the power to "appoint," or hire, necessary personnel (§ 31522.1), county governments retain final authority over their civil service classification and salaries. Such decisions are subject to judicial review for abuse of discretion, however, and a writ of mandate may issue if the

county unreasonably delays or withholds its approval of the retirement board's recommendations.

## I. BACKGROUND

Resolving the questions on appeal brings into play the intricate legal framework governing county employment and the powers conferred upon retirement boards.

A. *Legal Framework*

1. *County Employment and Civil Service*

The general rule is that governing bodies of California counties have the constitutional and statutory power to "provide for the number, compensation, tenure, and appointment of" their employees. (Cal. Const., art. XI, § 1, subd. (b); see Gov. Code, § 25300; see also *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 285 (*County of Riverside*).) In counties that have adopted a charter for their governance, the details of county employment are set by ordinance enacted by the county's governing body. (Cal. Const., art. XI, § 4, subd. (f).)

Los Angeles is a charter county governed by a Board of Supervisors. (L.A. County Charter, § 2.) The County's charter establishes a civil service system and designates all employment positions as "unclassified" or "classified." (*Id.*, §§ 30, 33.) Elected officials, heads of County agencies, and other identified executive positions are "unclassified," with all remaining positions being "classified." (*Id.*, § 33.) By charter, the County "has a formal civil service system . . . for filling classified positions and fixing the salary and benefits of classified employees." (*Holmgren v. County of Los Angeles* (2008) 159 Cal.App.4th 593, 602 (*Holmgren*).) Civil service rules exist to ensure fairness in the government workplace. They do so by

making access to government employment broadly and fairly available under clear criteria for employment and advancement. They are also designed to prevent favoritism or corruption by requiring that all employees are uniformly paid based on their qualifications, job duties, and performance. (See *Almassy v. Los Angeles County Civil Service Com.* (1949) 34 Cal.2d 387, 404 (*Almassy*); *Los Angeles County Employees Assn. v. Superior Court* (2000) 81 Cal.App.4th 164, 169–170.)

The County's civil service rules establish job classifications, hiring qualifications, criteria for recruiting and ranking candidates, and policies and systems for evaluating employees. (L.A. County Charter, § 35.) Here, as the Court of Appeal noted, the term " 'classification' " means " ' "a set of individual positions, suitable for similar treatment with respect to pay, examination procedures, and work assignments that are clustered or grouped by virtue of the similarity of the nature of work performed, the level of job complexity and responsibility required, the knowledge, skill and ability requirements, and the working conditions." ' " (*Los Angeles County Employees Retirement Assn. v. County of Los Angeles* (2024) 102 Cal.App.5th 1167, 1186 (*Los Angeles County Retirement*).) The County's Chief Executive Officer is responsible for classifying all employment positions and recommending salary ranges to the Board of Supervisors consistent with the policy of " 'equal pay for equal work.' " (*Ibid.*; see *California Attorneys, etc. v. Schwarzenegger* (2009) 174 Cal.App.4th 424, 436 (*California Attorneys*).) Once approved, these decisions are included in the County's annual salary ordinance.

2. *Laws Regulating County Retirement Systems*

a. *CERL*

In 1937, the Legislature enacted CERL, which established a comprehensive set of rules that counties may adopt to govern their public employee pension systems. "Each county system is administered by its own retirement board, which is tasked with implementing CERL's provisions." (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1052 (*Alameda County*).) Generally, the goal of a public pension plan "is to ensure payment of all vested, promised benefits to members, both those currently retired and those who will retire in the future." (*Imperial County Sheriff's Assn. v. County of Imperial* (2023) 87 Cal.App.5th 898, 903.) These benefits are funded "from three sources: employer contributions, employee contributions, and investment earnings and appreciation on the system's trust fund." (*Ibid.*) In a CERL system, the employer is typically the county itself, or a political subdivision or district within the county. (*Traub v. Board of Retirement* (1983) 34 Cal.3d 793, 798 (*Traub*).) Twenty counties have CERL pension plans. (*Alameda County*, at p. 1055.) The other 38 counties operate independent plans or contract with the state's Public Employee Retirement System (CalPERS; § 20000 et seq.). (*Alameda County*, at p. 1055.)

Shortly after CERL was enacted, the Los Angeles County Board of Supervisors passed an ordinance opting into the CERL system and adopting "all and every one of" its provisions. (L.A. County Code, § 5.20.010; see *Los Angeles County Retirement*, *supra*, 102 Cal.App.5th at p. 1186; *Holmgren*, *supra*, 159

Cal.App.4th at p. 603.)[2] Ten years after opting into CERL, the County established LACERA as a CERL system. (*Los Angeles County Retirement*, at pp. 1186–1187; *Howard Jarvis Taxpayers' Assn. v. Board of Supervisors* (1996) 41 Cal.App.4th 1363, 1373.) LACERA holds, invests, and administers the pensions and benefits of member employees. (*Weber v. Board of Retirement* (1998) 62 Cal.App.4th 1440, 1442 (*Weber*).) "Subject to a few exceptions for seasonal and part-time employees, all classified [C]ounty employees are automatically enrolled in" LACERA by operation of law. (*Holmgren*, at p. 603; see §§ 31550–31552.)

---

[2] That ordinance makes all of CERL's provisions binding upon the parties here. It states: "The board of supervisors of the county of Los Angeles, state of California, accepts the provisions of an Act of the Legislature of the state of California, entitled 'An act to provide for the creation, establishment, and adjustment with other systems, of a retirement system for employees of the several counties and districts as defined herein, and attaches of municipal courts, consisting of retirement compensation and death benefits,' approved June 30, 1937, being Chapter 677 of the Statutes of 1937 [CERL], and said board of supervisors does hereby, by reference adopt and incorporate all and every one of the provisions of said Act of the Legislature as a part of and applicable to, and make all and every one of said provisions a part of and applicable to, the system and schedules of compensation of all officers and other persons employed by the county whose compensation is fixed by the board of supervisors of the county and whose compensation is paid by the county, and all employees and officers of the county of Los Angeles now or hereafter established by ordinance of the board of supervisors, who are or may hereafter be eligible to the benefits of any retirement system under the provisions of said Act." (L.A. County Code, § 5.20.010.)

LACERA has both a "board of retirement" (§ 31520) and a "board of investments" (§ 31520.2). The Board of Retirement administers the system, while the Board of Investments manages LACERA's investment and actuarial policies. (*Los Angeles County Retirement, supra,* 102 Cal.App.5th at p. 1187; see *Weber, supra,* 62 Cal.App.4th at p. 1442.) In a CERL system, county retirement boards do not design individualized pension plans but instead implement the design enacted by the Legislature. (*Alameda County, supra,* 9 Cal.5th at pp. 1066–1067.) A retirement board's primary duties are to protect the system's assets through investment decisions and actuarial adjustments, to calculate and deliver benefits and services to system members, and to decide members' claims. (89 Ops.Cal.Atty.Gen. 152, 158 (2006).)

The complex interrelationship between a CERL retirement system and county government is regulated by the Government Code. CERL requires that the county treasurer sit on the retirement board (§§ 31520, 31520.1) and investment board (§ 31520.2). In addition to the county treasurer, half of the remaining members of a CERL retirement board or investment board are appointed by the county's board of supervisors.[3] Accordingly, the managerial as well as "the financial relationship between the county and the retirement system is a close one." (*Corcoran v. Contra Costa County Employees Retirement Bd.* (1997) 60 Cal.App.4th 89, 94

---

[3] In counties with five-member retirement boards, two members are appointed by the county. (§ 31520.) In counties with nine-member retirement boards, or with investment boards, four members are appointed by the county. (§§ 31520.1, 31520.2.)

(*Corcoran*); see, e.g., §§ 31590, 31595.1.)  Also, as relevant here, a retirement system's staffing decisions are guided by county requirements.  CERL authorizes retirement boards to "appoint such administrative, technical, and clerical staff personnel as are required to accomplish the necessary work of the boards," but these appointments must "be made from eligible lists created" under the county's civil service rules.  (§ 31522.1.)  Under CERL, these staff members "shall be county employees . . . subject to the county civil service or merit system rules" and must be included in the county's salary ordinance.  (§ 31522.1.; see *Corcoran*, at p. 94.)  Retirement boards may also appoint executive personnel, including senior administrators, chief investment and legal officers, and their deputies.  These executive personnel are also considered county employees, but they serve at the pleasure of the boards and are not subject to county civil service or merit system rules.  (§§ 31522.2–31522.4.)

Despite these ties to county government, a CERL retirement board is not a mere agent of the county.  A retirement board is not in privity with the county for preclusion purposes because it is "an independent entity" (*Traub*, *supra*, 34 Cal.3d at p. 798) with a "distinctive identity, constituency and interests" (*id*. at p. 799).  The board has "exclusive control" over investments of the retirement fund, which it must manage for the sole purposes of "providing benefits to participants . . . and their beneficiaries and defraying reasonable expenses of administering the system." (§ 31595.)  CERL also requires that retirement boards "annually adopt a budget covering the entire expense of administration of the retirement system, which expense shall be charged against the earnings of the retirement

fund." (§ 31580.2, subd. (a).)[4] In other words, all costs of administering the retirement system, including staff compensation, are paid from the retirement fund's investment earnings and not directly from county funds.

b. *Section 17*

The Constitution addresses the powers and responsibilities of public pension boards in section 17 of Article XVI, which covers Public Finance. Section 17 applies not just to county-level retirement boards, but to the retirement board of *any* public pension or retirement system operating in the state. A 1984 ballot initiative, Proposition 21, amended section 17 to make clear that public pension fund assets are held in trust. (See *O'Neal v. Stanislaus County Employees' Retirement Assn.* (2017) 8 Cal.App.5th 1184, 1202 (*O'Neal*).) Voters later expanded retirement boards' authority by enacting Proposition 162, the California Pension Protection Act of 1992. This initiative conferred upon retirement boards "plenary authority and fiduciary responsibility for investment of moneys and administration of the system, subject to" certain provisions. (Cal. Const., art. XVI, § 17.) Proposition 162 specified that retirement boards have "sole and exclusive fiduciary responsibility over" pension fund assets and must "administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries." (Cal. Const. art. XVI, § 17, subd. (a).) It further

---

[4] This requirement applies to all retirement systems with appointed staff, including those with specific legislation making their staff employees of the retirement system itself instead of the county. (§ 31580.2, subd. (a); see §§ 31522.1, 31522.5, 31522.7, 31522.9, 31522.10, 31522.11.)

provided that a retirement board's fiduciary duty to participants
and beneficiaries is paramount, taking precedence over any
other duty. (*Id.*, subd. (b).) The constitutional issue involved
here concerns the scope and application of Proposition 162's
grant of authority.

B.     *Historical Relationship Between the Parties*

LACERA manages the retirement fund for the County, for
the Los Angeles County Superior Court, and for several outside
districts. With a portfolio valued at over $72 billion and over
185,000 members and beneficiaries, it is the largest county
retirement system in the nation. In recent years, LACERA has
received approximately $3 billion annually from employee and
employer contributions and paid approximately $4 billion in
benefits. The $1 billion shortfall is paid from investment
earnings, which make up the great majority of LACERA's
annual income.[5]

To manage this system, LACERA has more than 400
employees. Their compensation is LACERA's largest
administrative expense. In each of the three years leading up
to this lawsuit, employee salaries and benefits comprised more
than three-quarters of total administrative costs. As CERL
requires (see § 31580.2, subd. (a)), LACERA maintains its own
budget, without County oversight. All administrative costs,
including salaries, are paid from LACERA's investment

---

[5]     For example, in the fiscal year ending June 30, 2021,
nearly 85 percent ($15.63 billion) of LACERA's total income
came from investment earnings. The remainder consisted of
contributions from employees ($761 million) and County
employers (approximately $1.95 billion).

earnings.  In July 1978, relying on sections 31522.1 and 31580.2
of CERL's statutory framework, LACERA began hiring fund
management personnel and charging the expense against its
own budget.  Previously, these fund management operations
had been handled by the County's Treasurer and Tax Collector's
Office and paid for from the County's general fund.

Nearly 20 years later, in 1996, LACERA obtained a formal
legal opinion regarding the extent of the County's authority over
the appointment of LACERA staff.  LACERA's external counsel
concluded section 31522.1 gave LACERA sole authority over
hiring, subject only to judicial review.  Thus, counsel opined, the
Board of Supervisors was required to honor LACERA's
classification and compensation decisions and include those
retirement board decisions in the County's salary ordinance.  At
the time, the County did not dispute counsel's conclusions.  It
removed LACERA employees from County collective bargaining
units and placed them into separate units governed by separate
memoranda of understanding.[6]

---

[6]     The dissent makes much of County Counsel's 1996 letter
acquiescing in the legal opinion offered by LACERA's retained
counsel.  (See dis. opn. of Groban, J., *post,* at pp. 6, 8, 20, 33.)
From this letter and documents expressly referencing it, the
dissent projects a 40-year history of "shared understanding" (*id.*
at p. 2) in which the County deferred entirely to LACERA,
implementing its every classification and salary decision
without question.  (See *id.* at pp. 33–34, 44.)  The record does
not support this assertion.  Indeed, it includes few specifics
about the parties' dealings on these matters before 1996, when
LACERA retained outside counsel to research whether the
Board of Supervisors had a ministerial duty to implement
LACERA's classification and salary decisions.  It is unclear why

Since these changes, LACERA has operated as an entity that is closely related to, albeit distinct from, the County. LACERA's operational budget is not included in the County's budget. LACERA employees are subject to the County's civil service rules, although these rules are administered by LACERA and not the County. LACERA personnel are assigned to civil service classifications established by the Board of Supervisors, but their classifications and payroll titles are unique to LACERA and separate from Countywide classifications and titles. The County administers LACERA's payroll, and LACERA uses some County resources for training staff and developing personnel policies. LACERA employees are eligible to participate in the County's CERL retirement plan and are offered the same fringe benefits, such as health care, provided to County employees. LACERA holdings fund these benefits, including the employer contribution for retirement.

C.    *This Dispute*

After decades of cooperation, disagreements arose. In 2016 and 2017, based on the results of two internal personnel reviews, the LACERA boards approved several new job classifications and salary adjustments for information technology, management, and administrative positions. In accordance with the parties' custom, LACERA asked the County to implement these personnel decisions in its salary ordinance. The County's Chief Executive Officer agreed to some of the requests but refused others, concluding the positions were "not supported," were not aligned with County classifications, or

---

seeking such an opinion would have been necessary if the parties were in agreement.

were beyond the salary range of comparable positions in the County or in other counties' retirement systems. In support of these refusals, County Counsel Mary Wickham wrote an opinion letter disavowing the County's previous position and asserting that LACERA lacked constitutional or statutory authority to usurp the County's control over the appointment and compensation of County employees. Wickham's opinion relied on the text of article XVI, section 17 as interpreted in *Westly*. In June 2018, the supervisors adopted a salary ordinance consistent with the County Counsel's views. LACERA did not challenge the 2018 ordinance.

The following year, a new chief executive officer joined LACERA and reviewed the organization's needs. In June 2021, LACERA sought County approval for three new positions and adjustments to the classifications and salary levels for eight existing positions. Several of these requests were for changes the County had already refused in 2018. The County's response was again largely negative. It approved only one new position (Deputy Chief, Investment Officer) at the salary level requested. It approved a second new position (Information Technology Manager II) but set a lower salary "based on internal alignment considerations with comparable County classifications and external salary data." A third new position (Principal Staff Counsel) was denied. The County also rejected all but one of LACERA's eight requested salary adjustments. The one adjustment it granted was at a lower salary than requested.

In October 2021, LACERA challenged these actions by seeking declaratory relief and a writ of mandate directing the County to implement the classification and salary adjustments it had denied. The case turned on whether LACERA or the

Board of Supervisors had the power to set classifications and salaries. The trial court denied relief. It interpreted Proposition 162 narrowly, relying on the analysis in *Westly*, *supra*, 105 Cal.App.4th 1095. Applying *Westly*, it determined that while Proposition 162 gave LACERA "plenary authority" over fund management and service delivery (Cal. Const., art. XVI, § 17), the initiative did not confer new power on retirement boards to set job classifications or salaries. The court further concluded LACERA's hiring power under CERL was subordinate to the County's constitutional and statutory authority to establish classifications and compensation for all County employees. It reasoned that section 31522.1 " 'permits LACERA to make *recommendations* to the Board of Supervisors . . . , but the Board of Supervisors does not have a ministerial duty to rubber stamp those requests in a salary ordinance.' " (*Los Angeles County Retirement*, *supra*, 102 Cal.App.5th at p. 1197, italics added.)

The Court of Appeal reversed, declining to follow *Westly*. It applied Proposition 162's phrase "plenary authority" broadly to conclude that the initiative gave retirement boards complete authority over "administration" (Cal. Const., art. XVI, § 17), including the power to establish job classifications and salary levels for the system's employees. (*Los Angeles County Retirement*, *supra*, 102 Cal.App.5th at pp. 1202–1204.) The court also disagreed with the trial court's analysis of the relevant CERL statutes. (*Los Angeles County Retirement*, at pp. 1218–1223.)

As noted, we granted review to resolve the conflict with *Westly* and to clarify the scope of retirement boards' authority on these issues.

## II. DISCUSSION

" 'A traditional mandamus is sought to enforce a nondiscretionary duty to act on the part of a court, an administrative agency, or officers of a corporate or administrative agency.' [Citation.] 'There are two requirements essential to issuance of a writ of mandate under Code of Civil Procedure section 1085: (1) the respondent [here, the County] has a clear, present, and usually ministerial duty to act; and (2) the petitioner [LACERA] has a clear, present, and beneficial right to performance of that duty.' " (*Pacifica Firefighters Assn. v. City of Pacifica* (2022) 76 Cal.App.5th 758, 765.) On review from denial of a mandate petition, we defer to the trial court's factual findings if they are supported by substantial evidence but independently review its rulings on questions of law. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1032 (*Professional Engineers*).) This case involves a purely legal question of which entity has the ultimate authority to approve the classification and salary decisions at issue. Accordingly, our review is de novo. (*Ibid.*; *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916.)

The claims here are both constitutional and statutory in nature. In resisting LACERA's writ petition, the County relies in part on constitutional provisions establishing what is colloquially known as the " ' "home rule" ' " doctrine. (*County of Riverside*, *supra*, 30 Cal.4th at p. 286; see Cal. Const., art. XI, §§ 1, subd. (b), 4, subd. (f).) The County asserts that, under the home rule provisions, it has the constitutional authority to appoint and fix the compensation of all County employees, including those who work for LACERA. It contends this

15

authority, as well as the collaborative relationships set out in
CERL, were not changed by the enactment of Proposition 162.
In sum, it urges that although LACERA has the statutory power
to appoint the staff needed to run the retirement system, the
County has the final say in deciding the classification and
compensation of these County employees.

LACERA counters that its employees are County
employees only insofar as they are subject to County civil service
rules and eligible to receive certain benefits of County
employment, like participating in the retirement system.
Notwithstanding the home rule provisions, LACERA urges that
Proposition 162 changed the legal landscape when it gave
retirement boards "plenary authority" over "administration of
the [retirement] system." (Cal. Const., art. XVI, § 17.)  It argues
this plenary authority over administration includes the power
to determine classification and compensation for its personnel.
LACERA further asserts that CERL imposes a ministerial duty
on the County to accept LACERA's classification and salary
designations and include them in the County's salary ordinance.
(See § 31522.1.)

Resolving these conflicts requires consideration of a
number of interconnected constitutional and statutory
provisions governing the powers of county retirement boards.
We first turn to the Constitution, then consider the related
statutory questions.

A. *Constitutional Authority over Retirement System
Appointments*

As noted, the California Constitution grants counties
control over employee hiring.  The constitutional powers of

counties are grounded in Article XI, which provides for "Local Government." Article XI divides the state into counties and requires that the Legislature provide for county powers, including the formation in each county of an elected governing body, such as a board of supervisors. (Cal. Const., art. XI, § 1.) In general law counties, the Constitution directs that the governing body "shall provide for the number, compensation, tenure, and appointment of employees." (*Id.*, subd. (b); see § 25300.) This " 'home rule' " provision was "specifically intended to deprive the Legislature of the power to set compensation for county employees and to entrust that authority to county governing bodies." (*County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322, 338 (*County of Sonoma*); see *Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1184 (*Retired Employees*).) Similar provisions apply to counties that have adopted a charter for their governance. (Cal. Const., art. XI, § 4.) In charter counties, such as Los Angeles County, the governing body has constitutional authority over "fixing and regulating . . . , by ordinance," the number of "persons to be employed" as well as their "powers, duties, qualifications, and compensation." (Cal. Const, art. XI, § 4, subd. (f).) "Under the 'home rule' doctrine, county charter provisions *concerning the operation of the county*, and specifically including the county's right to provide 'for the number, compensation, tenure, and appointment of employees' (that is, a county's core operations)" take precedence over conflicting state laws. (*Holmgren, supra,* 159 Cal.App.4th at p. 601; see Cal. Const., art. XI, § 4, subd. (g).) As germane here, the County urges that the home rule doctrine prevents statewide legislation from usurping county

governments' constitutional authority to set the salaries of their employees.

Elsewhere in the Constitution, article XVI, section 17 regulates the investment of public pension or retirement funds. The constitutional question here is whether Proposition 162's amendments to section 17 shifted authority over classification and salary setting for retirement system staff away from county governing bodies and to retirement boards. There is no dispute that voters have the authority to amend the Constitution in this way. The question is whether they intended to do so. To answer that question, we must construe article XVI, section 17, as that provision was amended by Proposition 162.

Familiar rules guide the analysis. "We apply the same interpretive principles to initiatives as to legislative enactments, beginning with the text as the best guide to voter intent and turning to extrinsic sources such as ballot materials when necessary to resolve ambiguities." (*In re C.B.* (2018) 6 Cal.5th 118, 125 (*C.B.*).) For a provision enacted by the electorate, "it is the voters' intent that controls." (*People v. Park* (2013) 56 Cal.4th 782, 796.) "Once the electorate's intent has been ascertained, the provisions must be construed to conform to that intent. [Citation.] '[W]e may not properly interpret the measure in a way that the electorate did not contemplate: the voters should get what they enacted, not more and not less.'" (*Ibid.*)

1. *Background Regarding Proposition 162's Passage*

Article XVI, section 17 "reached [its] current form through two ballot initiatives. The first, Proposition 21, [was] passed in 1984 in an apparent response to the emerging financial markets

of the 1980's." (*O'Neal, supra*, 8 Cal.App.5th at p. 1202.) Motivated by concerns that market changes made retirement benefits vulnerable to various risks, Proposition 21 amended section 17 and "introduced the principle that 'assets of a public pension or retirement system are trust funds' that 'shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system.' " (*O'Neal*, at p. 1202.)

The second ballot initiative, Proposition 162, was passed in 1992 in response to "actions by the Governor and Legislature to balance the state budget by limiting or delaying the state's employer contributions to CalPERS." (*Westly, supra*, 105 Cal.App.4th at p. 1100; see *O'Neal, supra*, 8 Cal.App.5th at p. 1203.) Among these actions, 1982 legislation had barred the state from making a portion of its employer contributions and required instead that any deficiencies be covered by CalPERS reserve funds. (*Westly*, at p. 1100; *Claypool v. Wilson* (1992) 4 Cal.App.4th 646, 655.) Then, in the early 1990's, the Legislature made several changes to delay the state's employer contribution payments. In 1990, it changed the payment schedule from monthly to quarterly; the next year, it changed the schedule to semiannually; and the year after that, it changed the schedule to " ' "semiannually, six months in arrears." ' " (*Westly*, at p. 1100; see *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1117.) In 1991, the Legislature also repealed statutes granting cost-of-living adjustments to retirees and passed legislation directing that these adjustment expenditures be allocated instead to defray the state's employer contributions. (*Claypool*, at pp. 657–658.) The same 1991 law transferred

many actuarial duties from the CalPERS retirement board to the governor. (*Id*. at p. 658.)

It was in this environment that voters passed Proposition 162, the California Pension Protection Act of 1992, and expanded the authority of public pension retirement boards. As amended by Proposition 162, the opening paragraph of article XVI, section 17 gives public pension retirement boards "plenary authority and fiduciary responsibility for investment of moneys and administration of the system." (Ballot Pamp., Gen. Elec. (Nov. 3, 1992) text of Prop. 162, § 4, p. 70, italics omitted (hereafter Ballot Pamp.).) Voters further delineated that responsibility in the subdivisions that follow. (*Id*., at pp. 70–71 [amending Cal. Const., art. XVI, § 17, subds. (a)–(h)].) Those subdivisions provide that a retirement board has "sole and exclusive fiduciary responsibility" over managing system assets and assuring prompt delivery of benefits and services to participants and their beneficiaries. (Cal. Const., art. XVI, § 17, subd. (a).) They return "the sole and exclusive power to provide for actuarial services" to retirement boards (*id*., subd. (e)) and specify that a board's duty to participants and their beneficiaries takes "precedence over any other duty" (*id*., subd. (b)). Other subdivisions address the selection and removal of retirement board members (*id*., subd. (f)), define the term " 'retirement board' " (*id*., subd. (h)), and provide that the Legislature "may . . . continue to prohibit certain investments" when in the public interest (*id*., subd. (g)). Finally, Proposition 162 left substantively unchanged two subdivisions that require retirement board members to act with prudence and diligence (Cal. Const., art. XVI, § 17, subd. (c)) and to diversify investments (*id*., subd. (d)). Taken together, section 17's

subdivisions shed light on the scope of the "plenary authority and fiduciary responsibility" the voters intended to confer. (Cal. Const., art. XVI, § 17.)[7]

---

[7] The full text of article XVI, section 17, with language added by Proposition 162 in italics, is as follows:

"Notwithstanding *any other* provisions *of law or this Constitution* to the contrary, the *retirement board of a public pension or retirement system shall have plenary authority and fiduciary responsibility for* investment of moneys *and administration* of *the* system, subject to all of the following:

"(a) *The retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system. The retirement board shall also have sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries.* The assets of a public pension or retirement system are trust funds and shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system.

"(b) The *members of the retirement board* of *a* public pension or retirement system shall discharge *their* duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system. *A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty.*

"(c) The *members of the retirement board* of *a* public pension or retirement system shall discharge *their* duties with respect to the system with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims.

"(d) The *members of the retirement board* of a public pension or retirement system shall diversify the investments of the system so as to minimize the risk of loss and to maximize the rate of return, unless under the circumstances it is clearly not *prudent* to do so.

*"(e) The retirement board of a public pension or retirement system, consistent with the exclusive fiduciary responsibilities vested in it, shall have the sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system.*

*"(f) With regard to the retirement board of a public pension or retirement system which includes in its composition elected employee members, the number, terms, and method of selection or removal of members of the retirement board which were required by law or otherwise in effect on July 1, 1991, shall not be changed, amended, or modified by the Legislature unless the change, amendment, or modification enacted by the Legislature is ratified by a majority vote of the electors of the jurisdiction in which the participants of the system are or were, prior to retirement, employed.*

*"(g) The Legislature may by statute continue to prohibit certain investments by a retirement board where it is in the public interest to do so, and provided that the prohibition satisfies the standards of fiduciary care and loyalty required of a retirement board pursuant to this section.*

*"(h) As used in this section, the term 'retirement board' shall mean the board of administration, board of trustees, board of directors, or other governing body or board of a public employees' pension or retirement system; provided, however, that the term 'retirement board' shall not be interpreted to mean or include a governing body or board created after July 1, 1991 which does not administer pension or retirement benefits, or the elected legislative body of a jurisdiction which employs participants in a public employees' pension or retirement system."* (Ballot Pamp., *supra*, text of Prop. 162, § 4, pp. 70–71, stricken text omitted.)

2.  *Textual Analysis*

The parties' constitutional dispute focuses on the first paragraph of section 17, which grants retirement boards "*plenary authority* and fiduciary responsibility for investment of moneys and *administration of the system*, subject to" the subdivisions that follow.  (Cal. Const., art. XVI, § 17, italics added.)  The first of these subdivisions states that a "retirement board shall . . . have *sole and exclusive responsibility to administer the system* in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries."  (*Id.*, subd. (a), italics added.)

The Court of Appeal interpreted these provisions broadly.  It reasoned that the word " 'plenary' means ' "[f]ull, entire, complete, absolute, perfect, unqualified." ' "  (*Los Angeles County Retirement*, *supra*, 102 Cal.App.5th at p. 1202.)  From there, it concluded Proposition 162's grant of "plenary authority" gave retirement boards "complete and absolute" power "subject only to the terms of Proposition 162 and judicial review."  (*Los Angeles County Retirement*, at p. 1202.)  This approach failed to consider the provision as a whole.  Proposition 162 grants retirement boards plenary authority over only the areas it addresses.  The question here is over what, exactly, that plenary authority extends.  Understood in light of its stated goals, supplementary materials, and place in the full scheme of related laws, the initiative's language does not sweep as far as the Court of Appeal concluded.

Even the most " 'broad and comprehensive' language" must be construed in context.  (*Castellanos v. State of California* (2024) 16 Cal.5th 588, 603.)  This principle applies to constitutional grants of "plenary authority" in the same way it

does to all other statutory language. For example, in *Independent Energy Producers Assn. v. McPherson* (2006) 38 Cal.4th 1020, 1035, the lower court had "relied upon a number of dictionaries that define 'plenary' to mean 'complete,' 'absolute,' or 'unqualified' " to conclude that " 'the phrase "plenary power" ' " in a constitutional provision " 'connotes total power, *to the exclusion of all others*.' " We rejected this analysis, explaining that the language had to be interpreted in light of the provision's purpose and objective. (*Id.* at pp. 1036–1038; see also *Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 342–345 [applying the same analysis to the grant of "plenary power" in article XIV, section 4, for the creation of a worker's compensation system].)

The Court of Appeal here adopted a similarly broad interpretation of the phrase "administration of the system." (Cal. Const., art. XVI, § 17.) In addition to section 17's opening paragraph, the phrase appears in two subdivisions that refer to a retirement board's duty of "defraying reasonable expenses of administering the system." (*Id.*, subds. (a), (b).)[8] As the Court of Appeal noted, this phrase echoes CERL's statutory directive that the assets of a pension fund be held "for the exclusive purposes of providing benefits to participants . . . and defraying reasonable expenses of administering the system." (§ 31595; see *Los Angeles County Retirement*, *supra*, 102 Cal.App.5th at p. 1203.) Another CERL provision in effect in 1992 implies that employee compensation is an "expense of administration"

---

[8] The language was added to the Constitution in 1984 by Proposition 21 and thus predates Proposition 162. (See Cal. Const., art. XVI, former § 17; see also Ballot Pamp., *supra*, text of Prop. 162, § 4, p. 70.)

because it requires that retirement boards charge "the entire expense of administration" against earnings *only* if they have appointed personnel. (§ 31580.2, subd. (a).) Because "[t]he electorate is presumed to be aware of existing laws" when it enacts an initiative (*Ruelas v. County of Alameda* (2024) 15 Cal.5th 968, 979 (*Ruelas*)), the Court of Appeal reasoned that Proposition 162's grant of "plenary authority" over "administration of the system" (Cal. Const., art. XVI, § 17) should be interpreted consistently with CERL to include authority over all personnel matters, including compensation. (*Los Angeles County Retirement*, at pp. 1202–1204.)[9]

A problematic aspect of this analysis was the court's reliance on select language in certain CERL statutes to assert that the same meaning was intended for the constitutional text of section 17. We have stressed that an initiative's words " 'must be construed in context, keeping in mind' " the purpose of the provision and, to the extent possible, harmonizing provisions related to the same subject. (*People v. Valencia* (2017) 3 Cal.5th 347, 357 (*Valencia*).) Although we do attempt to harmonize constitutional provisions with existing statutes to avoid a

---

[9] The court also relied on CERL provisions governing personnel appointments in specific counties. (*Los Angeles County Retirement, supra,* 102 Cal.App.5th at p. 1203.) In addition to prescribing certain terms of employment, these county-specific statutes direct that employee compensation "shall be an expense of administration of the retirement system." (§ 31522.5, subd. (c); see §§ 31522.9, subd. (d), 31522.10, subd. (c), 31522.11, subd. (c).) Because these statutes were not enacted until several years *after* the passage of Proposition 162, however, they cannot shed light on the meaning of the initiative's language.

conflict (*Ruelas*, *supra*, 15 Cal.5th at p. 979), it is the *operation*, and not necessarily the wording, of the different enactments that must be brought into harmony if possible (see *State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 955–956). Moreover, CERL does not afford an exclusive basis for comparison because section 17 sweeps more broadly than the county-level retirement systems CERL concerns. Section 17 describes the power of *any* "public pension or retirement system" board in California, ranging from city retirement systems to the statewide systems of CalPERS and the California State Teachers' Retirement System (CalSTRS). (Cal. Const., art. XVI, § 17.) Instead of looking to statutes that address limited aspects of some retirement boards' authority, the court should have first considered the " 'overall . . . scheme' " (*Professional Engineers*, *supra*, 40 Cal.4th at p. 1037) laid out in section 17 itself.

A more holistic reading sheds light on section 17's statement that retirement boards "shall have plenary authority and fiduciary responsibility for investment of moneys and administration of the system." (Cal. Const., art. XVI, § 17.) That statement explicitly provides that it is "subject to all of the following" and sets out eight subdivisions. (*Ibid*.) The Court of Appeal's approach was influenced by its interpretation of the phrase " 'subject to.' " (*Los Angeles County Retirement*, *supra*, 102 Cal.App.5th at p. 1204.) The court interpreted this language to mean that section 17's listed subdivisions functioned only to place limits or conditions on a retirement board's authority, but not to define the nature of that authority in the first place. (*Los Angeles County Retirement*, at p. 1204.)

As noted, the Court of Appeal here did not write on a clean slate when construing the meaning of "plenary authority" in

Proposition 162. The question was first considered in *Westly*, *supra*, 105 Cal.App.4th 1095, which the Court of Appeal declined to follow. *Westly* involved the legality of several actions the CalPERS retirement board took based on its reading of Proposition 162. (See Sen. Rules Com., 3d reading analysis of Sen. Bill No. 269 (2003–2004 Reg. Sess.) as amended June 2, 2003, p. 3.) Among other things, the CalPERS board had voted to exempt its portfolio managers from civil service, increase their salaries above the range set by the Department of Personnel (DPA), and pay them from the retirement fund without approval from the DPA or state Controller. (*Westly*, at p. 1105.) CalPERS then placed the managers on its own payroll system. (*Ibid.*; see Sen. Rules Com., 3d reading analysis of Sen. Bill No. 269, *supra*, at p. 3.) It went on to raise board member compensation and increase travel and other reimbursements beyond DPA-approved rates. (*Westly*, at p. 1103.) *Westly* held these actions violated laws regulating state civil service and payroll. (See *id.* at pp. 1099–1100, 1104.)

*Westly* rejected the board's argument that its "plenary authority" under Proposition 162 superseded laws authorizing the DPA to set civil service classification and salary ranges for CalPERS employees. Instead, the court concluded the initiative's grant of exclusive authority over "administration of the system" (Cal. Const., art. XVI, § 17) pertained specifically to "the management of the assets and their delivery to members and beneficiaries of the system, not the remuneration of those who administer it" (*Westly*, *supra*, 105 Cal.App.4th at p. 1110). *Westly* also rejected the CalPERS board's assertion that it needed authority over classification and salary setting to satisfy

27

its constitutional fiduciary duties. (*Id.* at p. 1114.)[10] In construing the relevant constitutional text, *Westly* observed that section 17's "subdivisions serve to limit *and define* the authority and responsibility granted in the [section's] initial paragraph." (*Westly*, at p. 1109, italics added.) The Court of Appeal here rejected this construction, instead viewing the subdivisions solely as limits on retirement boards' otherwise unfettered power.

We conclude, as did the *Westly* court, that the listed subdivisions define as well as limit a retirement board's plenary authority when the provision is considered as a whole. In statutory interpretation, "the phrase 'subject to' does not have a fixed meaning, but must be interpreted in context." (*People v. Steward* (2018) 20 Cal.App.5th 407, 420; see *People v. Morales* (2016) 63 Cal.4th 399, 407.) Some of section 17's subdivisions do place limits on retirement board authority, requiring that they use due care, diversify the system's investments, and place their duty to participants above all others. (See Cal. Const., art. XVI, § 17, subds. (b)–(d).) But other subdivisions define the boards' authority itself. Subdivision (a) grants "sole and

---

**10** Shortly after *Westly* was decided, an urgency measure was enacted authorizing the CalPERS and CalSTRS boards to establish civil service classifications and salary levels for certain senior executives and investment managers. (Stats. 2003, ch. 856, §§ 2–3, pp. 6263–6265.) The legislation's purpose was to enable these boards "to attract and retain key personnel" by offering compensation "competitive with the compensation paid to employees in other retirement and financial service entities, consistent with the holding of *Westly* . . . , and notwithstanding the provisions of the Government Code that provide the State Personnel Board and the [DPA] that authority." (Sen. Bill No. 269 (2003–2004 Reg. Sess.) § 1, subd. (e).)

exclusive responsibility to administer the system" but clarifies that a board must exercise that responsibility "in a manner that will assure prompt delivery of benefits and related services." (*Id.*, subd. (a).) Subdivision (b) confirms the limited scope of board members' authority by specifying that their duty to participants requires "minimizing employer contributions" and "defraying reasonable expenses" of administration. (*Id.*, subd. (b).) Subdivision (e) defines a board's "sole and exclusive power to provide for actuarial services" with no limitation at all (*id.*, subd. (e)), which contradicts the Court of Appeal's assertion that the subdivisions serve *solely* as limits on retirement boards' otherwise unfettered authority. We agree with *Westly* that, taken as a whole, section 17's subdivisions properly clarify the "plenary authority" that voters conferred over retirement system administration. (Cal. Const., art. XVI, § 17; see *Westly*, *supra*, 105 Cal.App.4th at p. 1109.)

Precisely how those subdivisions clarify the scope of authority is illuminated by their elaboration of the phrase "administration of the system." (Cal. Const., art. XVI, § 17.) Variations on this phrase appear in two places after section 17's prefatory paragraph. (See Ballot Pamp., *supra*, text of Prop. 162, § 4, pp. 70–71.) In the first, subdivision (a) states that a retirement board "shall . . . have sole and exclusive responsibility to *administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries*." (*Id.* § 4, subd. (a), p. 70, some italics omitted.) In the second, newly added subdivision (h) states that a " 'retirement board' " does not include "a governing body or board created after July 1, 1991 which does not *administer pension or retirement benefits*." (*Id.*

§ 4, subd. (h), p. 71, some italics omitted.)[11] Thus, both of Proposition 162's references to "administration" specifically concern the delivery of benefits.

*Westly* reasoned that retirement boards' "plenary authority" over "administration of the system" encompasses only the management of system assets and the delivery of benefits to members and beneficiaries. (*Westly*, *supra*, 105 Cal.App.4th at p. 1110.) It was not intended to eclipse other well-established constitutional and statutory allocations of authority over classification and compensation. (*Ibid.*) Our review of the constitutional text points to the same conclusion. All of the powers and responsibilities discussed in section 17 concern the supervision of a pension fund's investments and the proper distribution of benefits. None of the language added by Proposition 162 concerns retirement boards' authority over their staff's compensation or classification. (See *Westly*, at p. 1110.) Nor does other language in section 17 address this subject or say anything about the interaction of its provisions with civil service laws or the Constitution's home rule provisions. The Court of Appeal's contrary analysis here went astray by focusing heavily on the phrase "plenary authority" without considering the surrounding context and the purposes for which this language was included. Considered as a whole, section 17's text grants retirement boards exclusive authority over the management of system assets and the delivery of benefits and services, but it does not confer *new* authority over the classification or compensation of their personnel or otherwise upset settled interpretations of civil service or home rule jurisprudence.

---

[11] The application of this subdivision is not at issue here.

This interpretation is consistent with other Court of Appeal decisions that have rejected overly expansive interpretations of Proposition 162 asserted by retirement boards. *Singh v. Board of Retirement* (1996) 41 Cal.App.4th 1180 involved an employee's petition for a writ of mandate against a county retirement system that had denied him disability retirement benefits. The retirement board opposed the petition, arguing its plenary power to determine benefits could not be disturbed, even by the courts. (*Id.* at p. 1184.) The *Singh* court disagreed. It concluded Proposition 162 did not impliedly repeal the writ of mandate statute at issue (Code Civ. Proc., § 1094.5), and voters did not intend to insulate retirement board decisions from judicial review. (*Singh*, at pp. 1190–1192.) In a similar case the following year, a county retirement board argued its plenary authority under section 17 protected it from grand jury investigation. (*Board of Retirement v. Santa Barbara County Grand Jury* (1997) 58 Cal.App.4th 1185.) Again, the court disagreed, explaining that "Proposition 162 did not insulate pension boards from judicial oversight." (*Id.* at p. 1193.)

Finally, in *City of San Diego v. San Diego City Employees' Retirement System* (2010) 186 Cal.App.4th 69 (*City of San Diego*), a city retirement board asserted that its plenary authority to administer system assets gave it the ability to impose charges on the city for underfunded benefits. Relying on *Westly*, the court explained that retirement boards' authority is delineated in section 17 and does "not extend to matters within the purview of other branches of government" or "areas not expressly dedicated to the board." (*City of San Diego*, at p. 79.) The court concluded the city had exclusive jurisdiction over the

31

legislative act of granting retirement benefits. As a result, it was not within the board's power to expand benefits beyond those the city had provided. (*Id.* at p. 80.) Despite broad language added to section 17 by Proposition 162, the retirement board's power over benefits was limited to administering the benefits that had been set by the city. (*City of San Diego*, at p. 80.) Similarly, here, it is well settled that "the setting of [government] employee compensation is a legislative act that is part of the governing body's budgetary process." (*County of Sonoma*, *supra*, 173 Cal.App.4th at p. 347; see *Bagley v. City of Manhattan Beach* (1976) 18 Cal.3d 22, 25 (*Bagley*); *Collins v. City & County of San Francisco* (1952) 112 Cal.App.2d 719, 730.) Proposition 162 did not purport to expand retirement boards' authority to embrace the classification and compensation decisions that are within the purview of local governing bodies, nor can we agree with the Court of Appeal that it did so sub silentio.

The conflict between the Court of Appeal and other decisions construing Proposition 162 reveals that reasonable minds may draw different conclusions from the constitutional language. As a result of this textual ambiguity, we also consider extrinsic evidence of voter intent. (See *Valencia*, *supra*, 3 Cal.5th at p. 357.) "Specifically, we examine the materials that were before the voters." (*Id.* at p. 364.)[12]

---

[12] In addition to these materials, LACERA has asked that we take judicial notice of: a 2002 opinion letter setting forth the Contra Costa County Counsel's interpretation of Proposition 162's scope; an analysis of the initiative prepared by the California Senate Office of Research; and three newspaper articles expressing views on the initiative. We deny the request

3.     *Ballot Materials*

a.     *Findings and Declarations*

The electorate's intent comes into even sharper focus when considered in light of the ballot materials.  As noted, voters enacted Proposition 162 in response to a series of legislative acts that would have invaded CalPERS's retirement fund holdings and used them to defray the state's employer contributions or otherwise balance the state budget.  (See *ante*, at pp. 18–19; see also *Westly*, *supra*, 105 Cal.App.4th at p. 1100.)  Ballot materials demonstrate that the initiative was primarily designed to prevent retirement fund assets being appropriated and used for such a purpose.  The proposed law's Findings and Declarations asserted that politicians had undermined citizens' retirement security "by repeatedly raiding their pension funds."  (Ballot Pamp., *supra*, text of Prop. 162, § 2, subd. (c), p. 70.)  In order to protect pension funds and the retired employees who depend on

_____

in its entirety because the materials are irrelevant.  The opinion of a single county counsel 10 years after Proposition 162's enactment sheds no light on the voters' intent in passing the initiative.  (See *People v. Castro* (1985) 38 Cal.3d 301, 311.)  The Senate Office of Research analysis is also irrelevant because, even if it reflected the understanding of the Legislature as a whole, the Legislature did not draft Proposition 162, and LACERA has not shown that the analysis was distributed to voters.  (See *Castro*, at pp. 311–312.)  The first news article, published 10 months *after* the 1992 election, does not illuminate voter intent at the time of passage.  (See *id*. at p. 311; *Farmers Ins. Exchange v. Superior Court* (2006) 137 Cal.App.4th 842, 857–858.)  And, although the remaining news articles were published before the election, "there is no evidence that the electorate as a whole, or indeed any significant part of it, was aware of" them, or the views they expressed.  (*Valencia*, *supra*, 3 Cal.5th at p. 364, fn. 5.)

their solvency, the initiative declared that "politicians must be prevented from meddling in or looting pension funds" (*id.* § 2, subd. (d), p. 70) and "retirement board trustees must be free from political meddling and intimidation" (*id.* § 2, subd. (f), p. 70).

The Purpose and Intent section of the initiative listed similar concerns. It stated that the voters intended Proposition 162 to: "protect pension funds"; give voters control over the composition of retirement boards; prevent future tax increases that could be required if politicians were allowed to divert pension funds to other uses; ensure that fund assets are used exclusively to provide benefits; ensure that actuarial determinations are made exclusively by retirement boards; and affirm that a retirement board's duty to participants and beneficiaries takes precedence over all other duties. (Ballot Pamp., *supra*, text of Prop. 162, § 3, p. 70.) Of particular interest here, this section also declared voters' intent "[t]o give the sole and exclusive power over the management and investment of public pension funds to the retirement boards elected or appointed for that purpose, to strictly limit the Legislature's power over such funds, and to prohibit the Governor or any executive or legislative body of any political subdivision of this state from *tampering with public pension funds*." (*Id.* § 3, subd. (e), p. 70, italics added.)

Consistent with its broad interpretation of the initiative's text, the Court of Appeal read parts of this statement to infer a voter intent to shift classification and salary-setting authority. The court reasoned that such control was necessary to protect retirement systems from " 'meddling' " by county boards of supervisors. (*Los Angeles County Retirement*, *supra*, 102

Cal.App.5th at p. 1208.)  This inferential reading reaches too broadly and is not supported by the language in question.  As *Westly* observed, the initiative's declarations of purpose consistently indicate voters' desire "to protect pension *funds* by giving pension boards the authority to administer the funds without interference."  (*Westly*, *supra*, 105 Cal.App.4th at p. 1110.)  To this end, voters expressed an intent to give retirement boards "sole and exclusive power over the management and investment of public pension *funds*."  (Ballot Pamp., *supra*, text of Prop. 162, § 3, subd. (e), p. 70, italics added.)  A natural reading of the term "funds" here means the *assets* of a retirement system, which the system invests and uses to pay benefits to retired employees and their beneficiaries.[13]

The initiative consistently referred to risks posed by legislative and gubernatorial "raiding" (Ballot Pamp., *supra*, text of Prop. 162, § 2, subd. (c), p. 70), "looting" (*id.* § 2, subd. (d), p. 70), "plunder[ing]" (*id.* § 2 subd. (h), p. 70), or "tampering with public pension funds" (*id.* § 3, subd. (e), p. 70), all acts that would redirect those assets away from their intended purpose to ensure financial security for retirees and their beneficiaries.  It also identified a need to protect retirement board trustees "from

---

[13]    Although it might be possible to understand "funds" in some contexts as embracing something more than the invested money held in trust, that reading does not make sense given the syntax of section 3, subdivision (e), which refers to the "*investment* of public pension funds." (Ballot Pamp., *supra*, text of Prop. 162, § 3, subd. (e), p. 70, italics added.)  Moreover, a narrower reading comports more closely with other declarations, which express concern over the "looting [of] pension funds" (*id.*, § 2, subd. (d)) and a desire "to safeguard the competency of public pension funds" (*id.*, § 3, subd. (f)).

political meddling and intimidation" (*id.*, § 2, subd. (f), p. 70), from "political 'packing' " through the appointment process, and from political "encroachment" upon the boards' actuarial duties (*id.* § 2, subd. (g), p. 70). Yet none of these concerns reflects an intent to modify the long-established authority granted to county governments by constitutional home rule provisions and county charters to manage the county workforce as a consistent whole. Taken either individually or together, nothing in Proposition 162's findings or declarations suggests that voters intended to change the existing scheme of governmental oversight regarding the classification and compensation of retirement system staff who are identified as county employees.

b. *Legislative Analyst's Summary*

The Legislative Analyst's summary also gave no indication that the initiative would shift control over salary setting to retirement boards. As required by the Elections Code, the Legislative Analyst provides an impartial analysis of ballot initiatives to give "information the average voter needs to adequately understand the measure," including "the effect of the measure on existing law." (Elec. Code, § 9087, subd. (b); see *Valencia, supra,* 3 Cal.5th at pp. 365–366.) Here, after briefly describing how public retirement systems work and the recent legislation that prompted Proposition 162, the Legislative Analyst described three changes the initiative would make to these retirement systems. First, Proposition 162 would require that retirement boards have as their highest priority the provision of benefits. (Ballot Pamp., *supra,* analysis of Prop. 162 by Legis. Analyst, p. 37.) Second, it would prohibit the Legislature from changing the terms and conditions for retirement board membership without voter approval. (*Ibid.*)

Third, Proposition 162 would "give[] the board of each public pension system complete authority *for administration of the system's assets and for the actuarial function*." (Ballot Pamp., at p. 37, italics added.)

Notably, the Analyst's description of retirement boards' authority over administration is narrower than the far-ranging authority over all administrative matters asserted by LACERA and the Court of Appeal. Instead, consistent with *Westly*'s interpretation, the Analyst described Proposition 162's grant of authority as specifically encompassing "administration *of the system's assets*." (Ballot Pamp., *supra*, analysis of Prop. 162 by Legis. Analyst, p. 37, italics added.) A reasonable voter would understand this phrase to mean that the proposition would give retirement boards full authority over all aspects of managing the holdings of the pension fund itself, that is, collecting and investing contributions and paying benefits to retirees and their beneficiaries. But the phrase does not logically encompass a newly conferred authority to make decisions about the classification and compensation of civil servants who work for the retirement system.

The Legislative Analyst's summary repeated this narrower description of administrative authority in its discussion of Proposition 162's fiscal effect. The Elections Code requires that the Analyst's summary "includ[e] a fiscal analysis of the measure showing the amount of any increase or decrease in revenue or cost to state or local government." (Elec. Code, § 9087, subd. (a).) In this section, under the subheading Administration *of Assets*, the analysis of Proposition 162 stated: "Giving complete authority for administration *of public retirement system assets* to the governing boards could reduce

oversight of *these activities* by state or local government. This
would have an unknown effect on the costs of the systems."
(Ballot Pamp., *supra,* analysis of Prop. 162 by Legis. Analyst,
p. 37, italics added & boldface omitted.) This consistent and
repeated description conveyed that Proposition 162 gave
retirement boards authority over the administration of "assets,"
specifically, including their collection, investment, actuarial
supervision, and distribution. But it did not convey authority
over every arguably administrative matter. Like Proposition
162's findings and declarations, the impartial analysis
mentioned no change in which governmental entity ultimately
determines the classification and compensation of retirement
system employees.

### c.     *Arguments in Support and Opposition*

The ballot arguments presented for and against the
measure are also informative. The argument in favor of
Proposition 162 said nothing about giving retirement boards
exclusive authority over salaries or classification. Echoing the
uncodified findings and declarations, this argument explained
that Proposition 162 would "prevent politicians from raiding the
pension funds" of retired public employees. (Ballot Pamp.,
*supra,* argument in favor of Prop. 162, p. 38.) In doing so, it
would also prevent future tax increases that could be needed to
pay back money "loot[ed]" from public pension funds. (*Ibid.*)

The argument *against* Proposition 162 did touch on salary
setting. It accused state retirement board members of
numerous abuses and asserted that Proposition 162 would give
these board members more power with less taxpayer oversight.
(Ballot Pamp., *supra,* argument against Prop. 162, p. 39.) The
argument then cited an example: "Last year, in the middle of a

recession and a budget crisis, the PERS board voted to pay its top bureaucrat $110,000 a year. The State Controller blocked this pay increase, but would have no authority to stop other outrageous salary hikes if Proposition 162 becomes law." (*Ibid.*) The proponents' rebuttal argument did not engage directly with this point, noting more generally that the initiative's opponents were "trying to mislead the voters." (*Ibid.*) The rebuttal also argued the measure did not "have anything to do with retirement benefit levels." (*Ibid.*) Finally, the rebuttal responded to the argument's broader point by stressing that removing outside interference would protect pension funds, guarding against attempts to redirect those funds and avoiding the need for future tax increases. (*Ibid.*)

We have cautioned "that ballot measure opponents frequently overstate the adverse effects of the challenged measure, and that their 'fears and doubts' are not highly authoritative in construing the measure." (*Legislature v. Eu* (1991) 54 Cal.3d 492, 505.) However, if an objection is conceded by the initiative's proponents or ignored in their rebuttal argument, that circumstance may be relevant in discerning voters' understanding of a measure and their intent in adopting it. (See *ibid.*; see also *In re Gadlin* (2020) 10 Cal.5th 915, 939–940.) The opponents' argument here was not ignored. The rebuttal urged that opponents were "trying to mislead the voters" and pointed out that Proposition 162 would not alter benefit levels because "[o]nly legislative bodies . . . and voters themselves have the power to set benefit levels." (Ballot Pamp., *supra*, rebuttal to argument against Prop. 162, p. 39.) The County notes that benefit levels are closely tied to employees' salaries upon retirement. (See *Alameda County*, *supra*, 9

Cal.5th at p. 1057.)  Although a retirement benefit is not the
same thing as a salary, the argument spoke to the broader point
by refuting the opponents' concern about retirement boards
having unilateral authority.  Considered as a whole, the ballot
arguments do not demonstrate that voters intended to change
how retirement system employees are classified or
compensated.

### 4. *Consistency with Other Laws*

Finally, we consider whether inferring the authority
LACERA claims would be consistent with other laws that
govern public employment.  *Westly* interpreted Proposition 162
in a manner that would avoid conflicting with the constitutional
civil service provisions governing state employment.  (See
*Westly supra*, 105 Cal.App.4th at p. 1113.)[14]  We do the same.

---

[14]    Constitutional authority over state employees is vested in
the State Personnel Board, which is charged with enforcing and
administering the state civil service statutes.  (Cal. Const.,
art. VII, § 3.)  Unless specifically exempted, all state officers and
employees are included in the civil service system (*id*., § 1), thus
embedding in the Constitution "the principle that appointments
and promotions in state service be made solely on the basis of
merit" (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168,
183–184 (*Pacific Legal Foundation*)).  A bill passed after *Westly*
was decided allowed the CalPERS and CalSTRS boards to fix
the classification and compensation of their senior executives,
but it did not allow them to exempt these employees from civil
service entirely.  (See Stats. 2003, ch. 856, §§ 1, subd. (e), 2,
subd. (c), 3, subd. (c), pp. 6263–6264.)  This result is consistent
with the state's superior authority under article VII to maintain
a civil service system.  (See *Westly*, *supra*, 105 Cal.App.4th at
pp. 1103, 1113.)

"In choosing between alternative interpretations of constitutional provisions," beyond analyses of the relevant text and ballot materials, "we are further constrained by our duty to harmonize various constitutional provisions [citation] in order to avoid the implied repeal of one provision by another. Implied repeals are disfavored. [Citation.] 'So strong is the presumption against implied repeals' that we will conclude one constitutional provision impliedly repeals another only when the more recently enacted of two provisions constitutes a revision of the entire subject addressed by the provisions." (*City and County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 563; see also *Pacific Legal Foundation*, *supra*, 29 Cal.3d at pp. 197, 199.) To the extent possible, we must also " 'try to harmonize constitutional language with that of existing statutes.' " (*Ruelas*, *supra*, 15 Cal.5th at p. 979.) Because state and local governments are given broad constitutional and statutory authority over employment terms, the harmonization principle requires that we construe Proposition 162 in a way that fits within this existing scheme. " 'The inquiry is properly not so much which statutory scheme prevails [over the other], but rather how each can be harmonized to give them reasonable and full effect.' " (*Pacific Legal Foundation*, at p. 197.)

Article XI's home rule provisions grant county governments power over the terms of county employment. In charter counties, like Los Angeles, governing bodies "shall provide" for "[t]he fixing and regulation . . . , by ordinance, of the appointment and number of assistants, deputies, clerks, attaches, and other persons to be employed" and must "prescrib[e] and regulat[e] . . . the powers, duties, qualifications, and compensation of such persons," as well as the times and

terms of their appointment "and the manner of their appointment and removal." (Cal. Const., art. XI, § 4, subd. (f); see *id.* § 1, subd. (b) [granting similar authority to general law counties].) These provisions long predated Proposition 162. (See Cal. Const., art. XI, former § 5; see also *County of Sonoma, supra,* 173 Cal.App.4th at pp. 337–338.) The constitutional authority over compensation is also implemented by statute. To this end, section 25300 states: "The board of supervisors shall prescribe the compensation of all county officers, including the board of supervisors, and shall provide for the number, compensation, tenure, appointment, and conditions of employment of county employees. Except as otherwise required by Section 1 or 4 of article XI of the California Constitution, such action may be taken by resolution of the board of supervisors as well as by ordinance."

The pertinent language of article XI "is quite clear and quite specific." (*County of Riverside, supra,* 30 Cal.4th at p. 285.) It directs that "the *county,* not the state, not someone else, shall provide for the compensation of its employees" as well the terms of their employment. (*Ibid.*) This power has been interpreted broadly. In *County of Riverside,* we held the provision was violated by legislation requiring that counties submit certain union negotiation issues to binding arbitration. (*Id.* at pp. 282, 285–286; see *County of Sonoma, supra,* 173 Cal.App.4th at pp. 346–347 [finding amended version of the statute unconstitutional for the same reason].) In an earlier case, we concluded the constitutional home rule provisions for charter cities and counties were violated by a statute that withheld state surplus funds from local entities that gave their employees cost-of-living or salary increases exceeding those

provided to state employees. (*Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 314–318.)

Our interpretation harmonizes section 17 with article XI's home rule provisions. Although Proposition 162 gave retirement boards sweeping authority over all decisions concerning the investment and management of fund assets, the delivery of benefits and services, and the operation of the retirement system itself, it did not convey authority over employees' civil service classification or compensation. Consistent with article XI, the ultimate decisions on these matters remain within counties' longstanding control.

By contrast, accepting LACERA's interpretation of Proposition 162 would bring section 17 into direct conflict with the home rule provisions, working an implied repeal of article XI with respect to the compensation of county retirement system employees. "There is a strong presumption against repeal by implication. [Citation.] ' "Absent an express declaration of legislative intent, we will find an implied repeal 'only when there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are "irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation." ' " ' " (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1039.) This principle also applies to conflicting constitutional provisions, which must be harmonized to the extent possible to avoid an implied repeal. (*Board of Supervisors v. Lonergan* (1980) 27 Cal.3d 855, 868–869.)

The Court of Appeal addressed the tension between its interpretation of section 17 and article XI's home rule provisions

in two ways.  First, it acknowledged the conflict and resolved it by construing section 17 as an exception to the constitutional home rule provisions.  According to the Court of Appeal, while county governments may generally have authority over compensation for county employees, Proposition 162 created a limited exception to this rule for employees of county retirement systems.   (*Los Angeles County Retirement*, *supra*, 102 Cal.App.5th at pp. 1213–1214; see *Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 290.)  For this interpretation, the court focused on section 17's introductory phrase, which states that its provisions apply "[n]otwithstanding any other provisions of law or this Constitution to the contrary."  (Cal. Const., art. XVI, § 17; see *Los Angeles Retirement*, at p. 1213.)

Next, the Court of Appeal asserted that a conflict between its interpretation of section 17 and article XI could be avoided by narrowly interpreting counties' home rule authority to exclude retirement system employment.  " '[H]ome rule' authority is limited to matters concerning the structure and operation of local government." (*Dibb v. County of San Diego* (1994) 8 Cal.4th 1200, 1207.)  The Court of Appeal observed that "retirement systems are not county operations; they are independent entities established by state legislation and managed and administered by their boards, not by county boards of supervisors or any other county entity." (*Los Angeles County Retirement, supra*, 102 Cal.App.5th at p. 1215.)  Because retirement systems are independent from counties, the court reasoned, counties are given *no* constitutional authority over their employees under article XI.  As we explain, these attempts at harmonization fail.

In at least one context, we have observed that a county retirement system is "an independent entity" and "does not act as agent for the county." (*Traub, supra,* 34 Cal.3d at p. 798.) For this reason, we held that the requisite privity does not exist to bind a retirement board under res judicata principles to judgments against the county. (*Id.* at pp. 798–799.) But an entity's independence from the county for privity, or some other defined purpose, does not necessarily mean it is independent for all purposes. For example, a district attorney acts as a state official enforcing state policy when prosecuting Penal Code violations, but district attorney compensation is nevertheless prescribed by the county board of supervisors consistent with home rule authority. (See *Pitts v. County of Kern* (1998) 17 Cal.4th 340, 361.) Similarly here, the Court of Appeal's characterization of county retirement systems as fully independent oversimplifies the network of relationships outlined in CERL. No case has ever held that employees of county retirement systems are anything other than *county employees*.[15]

---

[15] The two cases the Court of Appeal relied on for this point do not support a different conclusion. In *Corcoran, supra,* 60 Cal.App.4th 89, the question was whether the county's retirement board or its board of supervisors was the " 'governing body' " for purposes of a former statute that restricted the retirement benefits available to new hires. (*Id.* at p. 92.) Though it held that the retirement board was the designated governing body within the meaning of that statute, *Corcoran* acknowledged that retirement system "employees are members of the county civil service and paid according to county salary schedules." (*Id.* at p. 95.) *Kern County Employees' Retirement Assn. v. Bellino* (2005) 126 Cal.App.4th 781 (*Kern County*) is similarly unavailing. There, a retirement system employee

As we discuss in greater detail below, CERL specifically provides that individuals who work for a county retirement system "*shall be county employees* . . . and shall be included in the salary ordinance or resolution adopted by the board of supervisors for the compensation of county officers and employees." (§ 31522.1, italics added.) It also defines an " '[e]mployee' " covered by the act to include anyone "employed by a county whose compensation is fixed by the board of supervisors." (§ 31469, subd. (a); see *post*, at pp. 51–52, 57–58.) The plain meaning of these statutes is that retirement system employees are county employees, a point LACERA does not dispute. Accordingly, article XI gives county governing bodies the home rule power to regulate the aspects of their employment relevant here. (Cal. Const., art. XI, §§ 1, subd. (b), 4, subd. (f).)

The Court of Appeal asserted this constitutional interpretation would call into question CERL statutes giving retirement boards the power to "appoint" staff, administrators, and various officers. (§ 31522.1; see §§ 315.22.2–31522.4; *Los Angeles County Retirement*, *supra*, 102 Cal.App.5th at p. 1216.) These provisions would be "constitutionally suspect," the court

sought to assume a seat on the county retirement board despite a non-CERL statute (§ 53227) prohibiting local agency employees from sitting on their agency's governing board. (*Kern County*, at pp. 785–786.) The court rejected the employee's argument that he was employed *solely* by the county, reasoning instead that the retirement system was "an additional employer" for purposes of section 53227. (*Kern County*, at p. 790; see *id*. at pp. 788–790.) Considered in context, both cases are consistent with our determination that retirement system employees are county employees for purposes of classification and compensation.

reasoned, "because an 'express grant of authority to the county necessarily implies the Legislature does not have that authority.'" (*Los Angeles County Retirement*, at p. 1215, quoting *County of Riverside*, *supra*, 30 Cal.4th at p. 285.) The short answer to this argument is that the pension administration laws established in CERL are "optional." (*Alameda County*, *supra*, 9 Cal.5th at p. 1055.) CERL establishes a public pension system that counties may choose to adopt. (*Alameda County*, at p. 1055.) The Legislature cannot compel them to do so. In fact, more than half of California's counties have elected otherwise. (See *ibid*.) However, the counties that "have chosen to implement their pension plans under CERL" agreed to be bound by its provisions. (*Ibid*.)[16] Under this arrangement, the retirement board has the power to hire necessary staff, but it does not have final authority to decide their compensation. Each of the statutes mentioned by the Court of Appeal specifies that personnel appointed by the boards "shall be county employees . . . and shall be included in the salary ordinance or resolution adopted by the board of supervisors for the compensation of county officers and employees." (§ 31522.1; see §§ 31522.2, 31522.3, subd. (a), 31522.4, subd. (a).)

Accordingly, we conclude *Westly*'s interpretation best harmonizes section 17 with other constitutional provisions. A retirement board's "plenary authority" over "administration of

---

[16] By enacting Los Angeles County Code section 5.20.010, the Board of Supervisors accepted "all and every one" of CERL's provisions and made them applicable to all those employed by the County "who are now or hereafter" eligible for retirement benefits under CERL. (See *ante*, at p. 6, fn. 2.)

the system" (Cal. Const., art. XVI, § 17) extends to the management and investment of the system's assets, actuarial services, and "the protection and delivery of the assets, benefits, and services for which the [b]oard has a fiduciary responsibility" (*Westly*, *supra*, 105 Cal.App.4th at p. 1110). But it does "not encompass areas not expressly dedicated to the board" (*City of San Diego*, *supra*, 186 Cal.App.4th at p. 79), including the power to set job classifications or compensation for retirement system employees. This interpretation honors the plain language of section 17, is consistent with Proposition 162's ballot materials, and avoids a conflict with the home rule provisions of article XI and other constitutional provisions. (See *Westly*, at pp. 1103, 1113–1114 [concluding a broad interpretation of section 17 would conflict with state's article VII authority over civil service].)

This narrower interpretation is also consistent with our analysis in *Alameda County*, *supra*, 9 Cal.5th 1032, which considered whether county retirement boards may agree to pay benefits beyond those authorized in CERL. While acknowledging that section 17 grants retirement boards "plenary authority" over "administration of the system" (Cal. Const., art. XVI, § 17), we concluded this administrative authority was bounded by "the design enacted by the Legislature through CERL" (*Alameda County*, at pp. 1066–1067). Quoting *Westly*, *supra*, 105 Cal.App.4th at page 1100, we explained that county retirement "boards do not have the authority to 'evade the law' that otherwise applies to their system." (*Alameda County*, at p. 1067.) Although they may "interpret CERL's provisions as necessary to perform their administrative functions," county retirement boards "have no

authority to adopt or act on an interpretation that is inconsistent with those provisions." (*Ibid*.)

Our decision in *Alameda County* thus interpreted retirement boards' "plenary authority" under section 17 narrowly. The provision had to be harmonized with existing laws, including the CERL statutes governing county retirement systems. While it is beyond dispute that providing benefits is a core function of retirement systems, we held that county retirement boards are not free to administer benefits in any way they want. Their exercise of this administrative power must be consistent with CERL. (*Alameda County*, *supra*, 9 Cal.5th at pp. 1066–1067.) The same principle applies here in regard to the classification and compensation of retirement system employees: To the extent retirement boards' constitutional authority over administration encompasses this subject, that authority must be exercised within the limitations imposed by the governing law. As the next section will discuss, CERL directs that retirement system personnel are county employees subject to the county's salary-fixing authority. (See § 31522.1.) In addition to the constitutional home rule provisions, our interpretation thus harmonizes section 17 with CERL, consistent with the reasoning of *Alameda County*.

B.     *Impact of Statutes Governing County Retirement Systems*

As a corollary to its constitutional arguments, LACERA contends the CERL statutes require that county boards of supervisors must automatically implement the staffing decisions reached by retirement boards exercising their "plenary authority." (Cal. Const., art. XVI, § 17.) It further urges that, even if the electorate did not shift salary and classification authority by enacting Proposition 162, the Legislature achieved

the same result by amending certain CERL provisions. These arguments fail. Again, historical context is important.

Building on its interpretation of Proposition 162, the Court of Appeal held that counties have a mandatory duty to implement the classification and compensation decisions of retirement boards because CERL statutes require that their employees' salaries be included in the county's salary ordinance or resolution. (*Los Angeles County Retirement*, *supra*, 102 Cal.App.5th at pp. 1218–1219.) As explained, the court's understanding was premised on an overly broad view of retirement boards' constitutional authority. A more straightforward reading of the relevant statutes and legislative history indicates that, while retirement boards have the power to hire necessary staff, the employees they hire remain subject to county civil service rules and the county's salary-setting authority.

Statutory analysis mirrors the approach employed for interpreting ballot initiatives. (*C.B.*, *supra*, 6 Cal.5th at p. 125.) " 'Our fundamental task is to ascertain the Legislature's intent and effectuate the law's purpose, giving the statutory language its plain and commonsense meaning. [Citation.] We examine that language in the context of the entire statutory framework to discern its scope and purpose and to harmonize the various parts of the enactment.' [Citation.] If the language is clear, ' "its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history." ' " (*Stone v. Alameda Health System* (2024) 16 Cal.5th 1040, 1052.)

1.    *CERL Background*

Three statutes are relevant to the issue here.  First, since 1947, section 31469 has defined the term "employee" for purposes of CERL.  (Stats. 1947, ch. 424, § 1, p. 1265.)  It states: " 'Employee' means any officer or other person employed by a county whose compensation is fixed by the board of supervisors[,] or by statute[,] and whose compensation is paid by the county, and any officer or other person employed by any district within the county."    (§ 31469,    subd. (a).)[17] Section 31469's definition is important because it identifies the public employees who are eligible to participate in a CERL system.  (*Holmgren, supra,* 159 Cal.App.4th at p. 605.)  The parties do not dispute that retirement system staff are " '[e]mployee[s]' " within the meaning of section 31469, subdivision (a) and entitled to CERL pension benefits.  (See *Holmgren,* at p. 603.)

Two other relevant statutes were enacted in 1973 by Assembly Bill No. 470 (1973–1974 Reg. Sess.).  Previously, all retirement system administrative costs were paid from counties' general funds (Legis. Analyst, analysis of Assem. Bill No. 470 (1973–1974 Reg. Sess.) June 25, 1973, p. 45) and all retirement system staff were appointed by, and worked under the direction

---

[17]    A related statute designates four specified retirement systems as districts separate from the county (see § 31468, subd. (*l*)), but LACERA is not one of them.  The retirement systems designated as districts are those of Orange County, San Bernardino County, Contra Costa County, and Ventura County. (§ 31468, subd. (*l*).)  The "district" definition is consistent with the different treatment for these county systems elsewhere in CERL.  (See §§ 31522.5, 31522.7, 31522.9–31522.11; see also *post,* at pp. 65–67.)

of, the county treasurer and board of supervisors (see Assem. Retirement Com., Analysis of Assem. Bill No. 470 (1973–1974 Reg. Sess.) as introduced Feb. 26, 1973; Agriculture and Services Com., Enrolled Bill Rep. on Assem. Bill No. 470 (1973–1974 Reg. Sess.) July 5, 1973, p. 1).  The Legislature changed both of these practices by passing Assembly Bill No. 470 to add sections 31580.2 and 31522.1 to the CERL statutory scheme. (Stats. 1973, ch. 269, §§ 1–2, p. 665.)

Section 31580.2 changed the source of retirement system administrative funding.  Rather than continue to cover administrative costs from the county general fund, section 31580.2 provided that "the entire expense of administration of the retirement system shall be charged against the earnings of the retirement fund."  (Former § 31580.2; Stats. 1973, ch. 269, § 2, p. 665; see Assem. Retirement Com., Analysis of Assem. Bill No. 470, *supra*, as introduced Feb. 26, 1973.)

Section 31522.1 modified the approach to hiring and oversight of retirement system employees.  As first enacted, section 31522.1 stated: "Both the board of retirement and the board of investment may appoint such administrative, technical, and clerical staff personnel as are required to accomplish the necessary work of the boards. The appointments shall be made from eligible lists created in accordance with the civil service or merit system rules of the county in which the retirement system governed by the boards is situated.  The personnel shall be subject to the county civil service or merit system rules and shall be included in the salary ordinance or resolution adopted by the board of supervisors for the compensation of county officers and employees." (Stats. 1973,

ch. 269, § 1, p. 665.)  In 1979, the last sentence of section 31522.1 was amended to read:  "The personnel *shall be county employees* and shall be subject to the county civil service or merit system rules and shall be included in the salary ordinance or resolution adopted by the board of supervisors for the compensation of county officers and employees." (§ 31522.1, italics added; see Stats. 1979, ch. 55, § 1, p. 136.)  As we explain, the effect of the 1979 amendment was to clarify that, even though the retirement board decides whom to hire from the county lists, those hired are still county employees.

Section 31522.1 is of particular importance.  Accordingly, like the parties and the Court of Appeal, we focus primarily on this provision.

2. *Text of Section 31522.1*

The language of section 31522.1 breaks down into three separate parts.  First, county retirement boards have the authority to "appoint," or hire, the personnel needed "to accomplish the necessary work of the boards."  (§ 31522.1.) Second, any such appointment must be made "from eligible lists created in accordance with the [county's] civil service or merit system rules." (*Ibid.*)  Third, personnel appointed by county retirement boards "shall be county employees," "shall be subject to the county civil service or merit system rules[,] and shall be included in the [county's] salary ordinance." (*Ibid.*)  Both sides agree that retirement boards may determine what staff they need and may appoint them as the statute provides.  Both sides also agree that staff must be hired from county civil service lists and that, once hired, staff are subject to the county's civil service

rules.[18]  The parties disagree about whether the boards' appointment power includes authority over classification and salary setting.  They also disagree about the significance of staff's designation as "county employees" and of the requirement that they "be included in the [county's] salary ordinance." (§ 31522.1.)

As the trial court observed, there are two equally plausible readings of the statutory language.  The first would be that retirement boards' appointment power necessarily includes the power "to determine job responsibilities and reporting relationships of the appointed employees [i.e., their classification]" and to set their salaries.  (*Los Angeles County Retirement, supra*, 102 Cal.App.5th at p. 1219.)  The Court of Appeal adopted this interpretation.  It reasoned that retirement boards are the appropriate party to decide what civil service classifications are needed "because boards of supervisors have no knowledge of or supervisory authority over the necessary work of retirement boards." (*Ibid*.)  Its interpretation of salary-setting authority was similar.  It concluded section 31522.1's directive that personnel appointed by retirement boards " 'shall be included in the salary ordinance or resolution adopted by the board of supervisors' " created "a mandatory duty for boards of supervisors to include in the relevant county's salary ordinance

---

[18]  This concession is at odds with LACERA's constitutional argument.  If Proposition 162 gave retirement boards complete authority over the hiring of retirement system staff, this constitutional authority would override CERL's directive that the employees be subject to county civil service rules.  Our interpretation of article XVI, section 17 avoids this problematic result.

the salaries adopted by a retirement board for its appointees."
(*Los Angeles County Retirement*, at pp. 1218–1219, italics
omitted.) The court found support for this interpretation in
section 31580.2, which changed retirement system budgeting to
charge all system administrative expenses, including
compensation, against fund earnings. The appellate court
reasoned that retirement boards need to know what salaries
they will be paying in order to create a budget, and they must
have control over setting those salaries in order to control the
budget and honor their fiduciary duties to system members.
(*Los Angeles County Retirement*, at p. 1220.)

The first assertion is undoubtedly correct. A responsible
budgeting process accounts for all anticipated expenses. The
second is not necessarily so. Policy decisions as to classification
and salary levels involve broader considerations than just the
source of funding and the details of efficient operation.
Classification and salary-level decisions are integral to the
whole civil service system. As a result, constitutional and
legislative determinations dictate who is ultimately authorized
to set salaries for civil service employees. In the case of county
employees, that authority is given to the county governing
board, such as a board of supervisors. (Cal. Const., art. XI, §§ 1,
subd. (b), 4, subd. (f).) This allocation of responsibility ensures
that an elected body is responsible for managing the county
budget *and* honoring the civil service mandates that promote
fairness in the workplace and seek to ensure that all
governmental employees are fairly and uniformly paid.

While retirement boards are given authority to "appoint"
staff, the statute makes clear that these employees must be
hired "from eligible lists created in accordance with the civil

service or merit system rules of *the county*" and, once hired, must "be subject to *the county* civil service or merit system rules." (§ 31522.1, italics added.) Job classifications are an inherent part of the civil service rules created by counties, for all county employees. Section 31522.1 expressly requires that retirement system personnel be part of that system. The statute says nothing about giving retirement boards the power to establish new classifications within the county's civil service system or to dictate, without county input, the classifications into which retirement system staff will be hired. Further, section 31522.1's requirement that retirement system personnel "shall be included in the salary ordinance or resolution adopted by the board of supervisors" need not be read as compelling boards of supervisors to merely accept and implement the salary recommendations of retirement boards. On the contrary, as the County argues, this directive is also consistent with the understanding of retirement system staff as "county employees" (§ 31522.1), whose salaries must be prescribed by ordinance according to longstanding constitutional and statutory provisions (Cal. Const., art. XI, §§ 1, subd. (b), 4, subd. (f); § 25300).[19]

---

[19] Despite section 31522.1's clear designation of them as such, the dissent contends retirement system personnel are not "county employees" for classification and compensation purposes because this reading would render redundant the statute's further directive that they "be included in the salary ordinance or resolution adopted by the board of supervisors for the compensation of county officers and employees." (§ 31522.1; see dis. opn. of Groban, J., *post*, at pp. 22–23.) But this language, which also appears in statutes addressing the appointment of executive personnel (see §§ 31522.2–31522.4), simply tracks CERL's definition of an " '[e]mployee' " eligible to

Section 31522.1 itself does not directly speak to which entity is responsible for determining job classifications and salary levels. However, this case requires us to discern its meaning on the question in the context of the entire statutory and constitutional framework. (See *Professional Engineers*, *supra*, 40 Cal.4th at p. 1037.) We conclude the County's interpretation of the statute's meaning is most consistent with CERL as a whole and the relevant constitutional provisions bearing on public employment.

As discussed, the Constitution gives counties full authority to set job requirements and compensation for their employees. As a charter county, Los Angeles, through its Board of Supervisors, has constitutional authority to "prescrib[e] and regulat[e] . . . the powers, duties, qualifications, and compensation" of County employees. (Cal. Const., art. XI, § 4, subd. (f); see § 25300.) Consistent with these provisions, CERL defines " '[e]mployee,' " in part, as a person employed by the county "whose compensation is fixed by the board of supervisors or by statute." (§ 31469, subd. (a).) Read in light of this definition and of counties' constitutional authority,

---

receive retirement benefits as someone "employed by a county whose compensation is fixed by the board of supervisors or by statute." (§ 31469, subd. (a); see *post*, at pp. 61–62.) As we have explained, the statutory construction rule to avoid surplusage "means surplusage as to *other statutory language*, not as to some possible judicial interpretation." (*Reno v. Baird* (1998) 18 Cal.4th 640, 658.) While applicable law does appear to require the inclusion of county employees' compensation in a salary ordinance or resolution, and a court would likely so conclude, "the Legislature may choose to state all applicable legal principles in a statute rather than leave some to even a predictable judicial decision." (*Ibid.*)

section 31522.1's statement that retirement system personnel "shall be county employees and shall be subject to the county civil service or merit system rules and shall be included in the salary ordinance or resolution adopted by the board of supervisors" is most reasonably understood to mean that, as with all other county employees, the staff appointed by retirement boards are subject to civil service classifications set by the county, with salaries included in the county's salary ordinance. The first sentence of section 31522.1 gives retirement boards the power to appoint their own staff. But in neither the remaining text of that statute, nor in any other CERL provision, is there a basis for concluding that the Legislature intended to remove classification and salary-setting powers from counties and give them to retirement boards instead.

This conclusion is consistent with other decisions that have considered the status of retirement system employees. For example, a 1986 Attorney General opinion observed that the expanded autonomy granted by sections 31522.1 and 31580.2 did "not mean that the retirement system will no longer be a part of county government. It will remain an integral part thereof." (70 Ops.Cal.Atty.Gen. 277, 278–279 (1987).) And in *Kern County*, *supra*, 126 Cal.App.4th 781, there was no dispute that a "nonmanagement employee" of a retirement system was a "county civil service employee." (*Id.* at p. 785; see *id.* at p. 789.) The only question in *Kern County* was whether the county employee was *also* a retirement system employee who, for that reason, would be barred from holding a position on the retirement board. (See *id.* at pp. 788–790.)

It is true that appellate decisions have not regarded retirement system staff as county employees for *all* purposes. The personnel whose salaries are at issue here are employees who do work for the retirement system. Thus, under *Kern County*, the retirement system is an "additional employer." (*Kern County*, *supra*, 126 Cal.App.4th at p. 790.) But that reality does not mean retirement system staff are not also county employees, as the CERL statutes require. Similarly, the Court of Appeal in *Corcoran* held that a retirement board, and not the county board of supervisors, was the "governing body" empowered to determine the tier of retirement *benefits* for system employees, while at the same time it acknowledged that, as to their salary, the "employees are members of the county civil service and paid according to county salary schedules." (*Corcoran*, *supra*, 60 Cal.App.4th at p. 95.) These decisions do not establish that retirement boards have the sole authority to set civil service classifications or salaries for their staffs, as LACERA argues. They merely illustrate the complex interrelationship of county governments and retirement boards, both of which have roles to play under CERL in the hiring and compensation of retirement system personnel.

In reaching a contrary conclusion, the Court of Appeal here determined that the only significance of the amendment to section 31522.1's final sentence, stating that retirement system staff "shall be county employees . . . included in the salary ordinance," was to impose a mandatory duty on boards of supervisors to implement retirement board compensation decisions in the county's salary ordinance. (*Los Angeles County Retirement*, *supra*, 102 Cal.App.5th at p. 1218, italics omitted.) The court's interpretation rested in part on the statute's use of

the word "shall" in directing that retirement system personnel
"shall be included in the salary ordinance or resolution adopted
by the board of supervisors." (§ 31522.1; see *Los Angeles County
Retirement*, at p. 1219.)

A number of decisions have acknowledged that the term
"shall" can have various meanings, particularly when
determining whether a provision is mandatory, thus making it
enforceable by writ of mandate. Although courts " 'ordinarily'
construe . . . the word 'shall' as mandatory," we have explained
that the Legislature's use of this word "is merely indicative, not
dispositive or conclusive" on the question whether a mandatory
duty has been imposed. (*Tarrant Bell Property, LLC v. Superior
Court* (2011) 51 Cal.4th 538, 542; see *Guzman v. County of
Monterey* (2009) 46 Cal.4th 887, 899.) The word "shall" may be
intended to impose a mandatory duty, or it may signify "a mere
obligation to perform a discretionary function." (*Creason v.
Department of Health Services* (1998) 18 Cal.4th 623, 631.) But
even assuming "shall" created a mandatory duty here, the Court
of Appeal's analysis failed to focus on just what mandatory duty
section 31522.1 imposed. The statute directs boards of
supervisors to include the salaries of retirement system staff in
the county's salary ordinance. That budgetary inclusion duty is
mandatory. But, as explained, section 31522.1 did not change
the law regarding which entity is authorized to *set* those
salaries. The appellate court interpreted section 31522.1 to
require that counties include the salaries of retirement system
staff *as set by the retirement board*, yet those words appear
nowhere in the statute. It is axiomatic that courts "may not
rewrite [a] statute to conform to an assumed intention that does

not appear in its language." (*Vasquez v. State of California*
(2008) 45 Cal.4th 243, 253.)

The Court of Appeal's interpretation is also at odds with
the settled rule that "fixing compensation is legislative in
character" and as such is a discretionary act. (*Bagley*, *supra*, 18
Cal.3d at p. 25; see *Kugler v. Yocum* (1968) 69 Cal.2d 371, 374.)
The appellate court responded to this point by asserting that
county boards of supervisors have no such discretion because all
decisions about compensation are solely for retirement boards to
make. (*Los Angeles County Retirement*, *supra*, 102 Cal.App.5th
at p. 1220.) But the argument is circular. It simply asserts that
the board of supervisors has no discretion because it has no
discretion. In any event, if the Legislature had intended to
remove a board of supervisors' discretionary "legislative"
(*Bagley*, at p. 25) power to determine compensation, one would
expect this intent to be clearly indicated in the statutory text. It
is not.

Finally, one other CERL statute requires clarification.
Section 31469 defines who is an "employee" entitled to receive
retirement benefits in a CERL system. (See *Holmgren*, *supra*,
159 Cal.App.4th at p. 603.) Since its enactment in 1947, the
applicable provision of that statute has defined " '[e]mployee' "
as someone "employed by the county whose compensation is
fixed by the board of supervisors or by statute *and whose
compensation is paid by the county*." (§ 31469, subd. (a), italics
added; see Stats. 1947, ch. 424, § 1, p. 265.) When
section 31580.2 was enacted decades later in 1973 to provide
that all administrative expenses be paid from retirement fund
earnings, the italicized phrase no longer accurately described
retirement system employees because, going forward, their

compensation was to be paid not from the county's general fund but by the retirement system itself. (See *Corcoran, supra*, 60 Cal.App.4th at p. 94.) Any uncertainty this change created was rectified in 1979 when the Legislature passed an urgency measure amending section 31522.1 to add that staff appointed by retirement boards "shall be county employees." (Stats. 1979, ch. 55, § 1, p. 136.) The amendment was described as "nonsubstantive and . . . *only intended to clarify the[] status*" of retirement system employees. (Off. of Employee Relations, Enrolled Bill Rep. on Assem. Bill No. 132 (1978–1979 Reg. Sess.) May 8, 1979, p. 1, italics added.)

LACERA argues this history shows that the Legislature's sole purpose in designating retirement system staff "county employees" in section 31522.1 was to clarify their eligibility for retirement benefits under section 31469. But the Legislature employed broader language than that mentioned by LACERA. It did not amend section 31522.1 to say that retirement system staff are county employees *only for purposes of section 31469.* LACERA's interpretation invites us to read in a limitation that is not present in the statutory language. Again, "[i]t is not for us to insert a limitation the Legislature excluded. [Citation.] A court 'may not rewrite a statute, either by inserting or omitting language, to make it conform to a presumed intent that is not expressed.'" (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 171.)

The amendment to section 31522.1 provided, without limitation, that retirement system personnel "shall be county employees" (§ 31522.1), in a change that was described as "nonsubstantive" (Off. of Employee Relations, Enrolled Bill Rep. on Assem. Bill No. 132, *supra*, p. 1). The County reasonably

reads this history to mean that the Legislature has always, and continues to, regard retirement system staff as county employees, subject to the county's civil service rules and salary-setting authority. The amendment was adopted to remove any confusion that might arise in light of section 31580.2's change to the funding source of retirement systems' administrative costs. The County's interpretation is most consistent with the relevant statutory text.[20]

3. *Legislative History*

The legislative history of Assembly Bill No. 470, which enacted section 31522.1, is not extensive on the issue before us. But it appears the Legislature intended that counties retain

---

[20] Moreover, the County points out that, for retirement system participation, CERL defines an " '[e]mployee' " as *both* a "person employed by a county whose compensation is fixed by the board of supervisors or by statute and whose compensation is paid by the county *and* any officer or other person employed by any district in the county." (§ 31469, subd. (a), italics added.) If the Legislature had intended to remove salary-fixing authority from county boards of supervisors, it could have specified that retirement system staff were employees, not of the county, but of a "*district* in the county." (*Ibid.*, italics added.) As we will discuss, this is exactly the solution the Legislature employed for a handful of retirement systems that have specific authorization to operate independently from their counties. (See *post*, at pp. 65–70.) The designation makes employees of these retirement systems eligible for benefits under CERL even though, as employees of a "district," they are not county employees, and their compensation is not fixed by their county boards of supervisors. (See §§ 31469, subd. (a), 31522.5, subd. (b), 31522.7, subd. (b), 31522.9, subd. (a), 31522.10, subd. (b)(1), 31522.11, subd. (b).) If LACERA's interpretation of section 35122.1 were correct, none of this county-specific legislation would have been necessary.

their longstanding classification and salary-setting authority over retirement system personnel.

One enrolled bill report explained that, though the "appointment of employees [fell] within the jurisdiction of the Board of Supervisors[,] as in other county departments," Assembly Bill No. 470 "would vest such *appointing* authority in [retirement system] boards *subject however, to county civil service and salary fixing authority*." (Agriculture and Services Agency, Enrolled Bill Rep. on Assem. Bill No. 470, *supra*, at p. 1, italics added.) This report thus confirmed that retirement system staff would remain county employees and the bill would preserve counties' traditional "salary fixing authority." (*Ibid*.) "[W]e have routinely found enrolled bill reports, prepared by a responsible agency contemporaneous with passage and before signing, instructive on matters of legislative intent." (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 934, fn. 19; see *Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 49–50 & fn. 15.)

More importantly, nothing in the legislative history reflects an intent to remove counties' longstanding control over salary setting or to impose a mandatory duty on county boards of supervisors to merely accept and implement retirement boards' salary determinations. *After* Assembly Bill No. 470's passage, county treasurers urged the governor to veto the bill because it removed their power to appoint those overseeing retirement system budgets. (See, e.g., James A. Hayes, County of Los Angeles Board of Supervisors, letter to Governor Ronald Reagan, July 10, 1973; Harold J. Ostly, State Assn. of County Retirement System Administrators, letter to Governor Ronald Reagan, July 10, 1973.) Opposition letters also complained

about consequences that could result from counties' loss of control over appointments (see, e.g., President Charles J. Pesce, State Assn. of County Treasurers, letter to Governor Ronald Reagan, July 3, 1973) and the large budgets of retirement systems (see, e.g., Robert L. Citron, Orange County Tax Collector-Treasurer, letter to Governor Ronald Reagan, July 6, 1973).  However, not one letter, nor any other recorded opposition, expressed a concern that counties would lose control over fixing the salaries of retirement system employees or would be forced to implement the salary determinations made by retirement boards.[21]

4.    *Subsequent Legislation Creating Retirement System Districts*

Section 31522.1's intended meaning is also illuminated to some degree by later enactments that carve out exceptions for specific retirement systems.  The Legislature's consistent

---

[21]    The one letter that appears to have been distributed to legislators, from County Treasurer and Tax Collector Harold J. Ostly (Harold J. Ostly, County of Los Angeles Office of the Treasurer and Tax Collector, letter to Assemblyman Bob Wilson, April 17, 1973 (Ostly letter)) did not "argue[] that retirement board members lacked the 'expertise' to decide what personnel were necessary to administer the retirement system" or "contend[] that county treasurers were better equipped to carry out such duties."  (Dis. opn. of Groban, J., *post*, at p. 16.)  The letter did not mention personnel decisions at all.  Instead, it complained about the potential inefficiency it claimed could result from asking retirement board members, who might lack an administrative background, to shoulder an "added administrative burden" while county treasurers remained responsible for administration of the retirement system as a whole.  (Ostly letter, p. 1.)

understanding of a prior statute, while not binding, is entitled to due consideration. (See *Jarman v. HCR ManorCare, Inc.* (2020) 10 Cal.5th 375, 389; *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244.) Legislative developments following the enactment of sections 31522.1 and 31580.2 consistently display an understanding that, absent a specific exception, county governments have final authority over the classification and compensation of retirement board personnel.

In 2002, the Legislature passed laws applicable to Orange County alone. First, the Legislature added section 31522.5, which permitted Orange County's retirement board to appoint an administrator and certain executive staff who, "[n]otwithstanding any other provision of law, . . . may *not* be county employees but shall be employees of the retirement system, subject to terms and conditions of employment established by the board of retirement." (Stats. 2002, ch. 74, § 2, p. 590, italics added.) At the same time, it amended section 31468 to define the Orange County retirement system as a "district" (Stats. 2002, ch. 74, § 1, p. 590), thus enabling these specific employees to be eligible for CERL benefits even though their compensation is not "fixed by the [county] board of supervisors or by statute" (§ 31469, subd. (a)).

After a series of amendments, section 31522.5 now applies to the San Bernardino County retirement system and a new statute, section 31522.11, governs the Orange County system. Over the next several years, similar legislation created district

status for the retirement systems of Contra Costa (§ 31522.9),[22] Ventura (§ 31522.10), and San Bernardino (§§ 31522.5, 31522.7) counties.  All of these district-creating statutes provide that the staff members in question "shall *not* be county employees but shall be employees of the retirement system."  (§ 31522.10, subd. (b)(1), italics added; see §§ 31522.5, subd. (b), 31522.7, subd. (b), 31522.9, subd. (a), 31522.11, subd. (b).)  Each of these four retirement systems has also been specifically designated a " '[d]istrict' " under CERL.  (§ 31468, subd. (*l*).)

Legislative history confirms that these new laws were specifically intended to shift control over compensation, at least for some executive personnel, from the counties to their retirement boards.  It also makes clear that the affected personnel are not civil service employees of the county.  For example, when the first bill was under consideration, a letter to the Senate Public Employment and Retirement Committee Chair advised that it would give the retirement board "the flexibility to create specific job descriptions, recruit and retain specially trained pension professionals and set compensation levels commensurate with industry standards." (Keith Bozarth, Orange County Employees Retirement System, letter to Sen. Nell Soto re Assem. Bill No. 1992 (2001–2002 Reg. Sess.) May 24, 2002.)  Committee reports stated the bill would exempt certain employees from county civil service and would make their compensation an expense of the retirement system. (Sen. Public Employment and Retirement Com., Analysis of Assem.

---

[22]    The Contra Costa County statute is not limited to executives but applies to all staff of the retirement system. (§ 31522.9, subd. (a).)

Bill No. 1992 (2001–2002 Reg. Sess.) June 10, 2002, p. 2.) They also noted supporters' belief that the bill would give the retirement system the flexibility needed to hire and retain professional staff. (*Ibid.*) An enrolled bill report concerning the San Bernardino legislation explained that, by reclassifying the system as a "district" independent from the county, the retirement board would be able to pay its investment managers higher salaries. (Off. of Planning and Research, Enrolled Bill Rep. on Sen. Bill 777 (2005–2006 Reg. Sess.) Aug. 28, 2006, pp. 1, 2, 4.) Similar statements appear in committee reports for other bills. (See, e.g., Assem. Com. on Public Employees, Retirement, and Social Security, Rep. on Assem. Bill No. 1291 (2015–2016 Reg. Sess.) May 6, 2015, p. 2; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1291 (2015–2016 Reg. Sess.) as amended May 27, 2015, p. 4; Sen. Com. on Labor, Public Employment & Retirement, Analysis of Assem. Bill No. 761 (2021–2022 Reg. Sess.) June 7, 2021, p. 2.)[23]

Some committee reports also reflect an understanding that, in the absence of specific legislation, counties retain control

---

[23]  The Court of Appeal discounted the significance of the county-specific statutes, asserting they were "likely . . . precipitated by the litigation in *Westly*." (*Los Angeles County Retirement, supra,* 102 Cal.App.5th at p. 1227.) Yet no mention of the *Westly* decision is to be found in the legislative history of these several bills. Similarly, the dissent offers no contrary explanation for the district-creating laws beyond speculating that the Legislature "may well have" wanted "to remove any uncertainty" as to retirement boards' authority under existing law. (Dis. opn. of Groban, J., *post,* at p. 37.) The Legislature did not express such an intent. Further, why such a clarification would be given only to four specific counties is left unexamined.

over compensation decisions.  For example, one report explains that, under existing law, retirement system employees' compensation is "limited to the county's salary ordinance." (Sen. Com. on Labor, Public Employment & Retirement, Analysis of Assem. Bill No. 761, *supra*, p. 2.)  Another states that existing law provides that retirement system employees are "subject to the county civil service or merit system rules adopted by the board of supervisors for the compensation of county officers and employees." (Sen. Rules Com., Off. Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 673 (2013–2014 Reg. Sess.) as amended Jan. 23, 2014, p. 2.)[24]

---

[24]    As evidence of a contrary understanding, the dissent quotes from a committee report on the Contra Costa bill that, "[u]nder existing law, the [Contra Costa Employees Retirement Association] has authority to establish compensation for retirement system employees," whereas "the Board of Supervisors has responsibility to establish civil service rules and enter [Memoranda of Understanding] for all county employees, and the Auditor-Controller provides payroll and oversight services." (Sen. Public Employment & Retirement Com., Analysis of Sen. Bill No. 673 (2013–2014 Reg. Sess.) as amended Jan. 6, 2014, p. 3; see dis. opn. of Groban, J., *post*, at pp. 37–38.)  However, this statement appears in a section of the report discussing the *claims in a lawsuit* that ultimately gave rise to the legislation in question. (See Sen. Public Employment & Retirement Com., Analysis of Sen. Bill No. 673, *supra*, at p. 3.)  In the section that sets forth the "Existing law" to be affected by the bill, the report states that existing law "provides that [Contra Costa Employees Retirement Association] retirement system employees *are county employees* subject to the county civil service or merit system rules adopted by the board of supervisors *for the compensation of county officers and employees*." (*Id.* at p. 1, italics added.)

The Legislature's understanding that salary decisions are ordinarily under the aegis of boards of supervisors demonstrates why statutes tailored to the specific needs of certain counties were deemed necessary. Over the course of two decades, the Legislature has acted to designate four retirement systems as separate districts, with their own measure of authority over classification and salary setting. That so many parties, over so many years, undertook specific legislation to shift salary-setting power from counties to retirement boards provides a strong indication that retirement boards did not have this power all along, as LACERA now contends. None of this substantial legislative action would have been necessary if, as LACERA urges, the shift in salary-setting authority had taken place years before when section 31522.1 was enacted. If the electorate, or their representatives, determine that a different approach to salary and classification is preferable, these actions show that it is possible to achieve that result. The solution, however, lies in properly adopted legislative change, not in an approach that ignores the existing legislative and constitutional structure.

### 5. *Consistency with Constitutional Provisions*

Finally, we are persuaded that the County's understanding of section 31522.1 is correct because a contrary interpretation would raise serious constitutional questions. As discussed, the constitutional home rule provisions (Cal. Const., art. XI, §§ 1, 4) were adopted to prevent state encroachment on counties' core powers, including specifically their power to determine the compensation of county employees. (*County of Riverside, supra,* 30 Cal.4th at pp. 285, 289–290; *County of Sonoma, supra,* 173 Cal.App.4th at p. 338.) The animating purpose of the home rule provisions was to " 'prevent

interference by the state government' " in the management of local affairs. (*Younger v. Board of Supervisors* (1979) 93 Cal.App.3d 864, 869.) Of particular relevance here, the purpose of these constitutional provisions "was ' "to give greater local autonomy to the setting of salaries for county officers and employees, *removing that function from the centralized control of the Legislature.*" ' " (*Retired Employees*, *supra*, 52 Cal.4th at p. 1184.) "Although the [provisions'] language does not expressly limit the power of the Legislature, it does so by 'necessary implication.' " (*County of Riverside*, *supra*, 30 Cal.4th at p. 285.) Accordingly, there is serious reason to question whether the Legislature could have unilaterally revoked counties' salary-setting authority in enacting section 31522.1, as the dissent and LACERA contend, without violating the Constitution.[25]

The dissenting opinion argues the home rule provisions do not apply because retirement system staff are not truly "county

---

[25] At times, the dissenting opinion appears to misapprehend our point about the significance of the home rule provisions on this issue. We do not contend "CERL *provides* counties 'home rule' authority over retirement system staff." (Dis. opn. of Groban, J., *post*, at p. 20, italics added; see also *id.* at p. 28 [expressing doubt "that the Legislature intended to give counties home rule authority"].) To the extent counties enjoy home rule authority over their employees, that authority is derived from article XI of the Constitution, not from CERL. Nor do we agree with the dissent that home rule authority extends only to personnel the Legislature saw fit to expressly define as county employees in enacting CERL. (See dis. opn. of Groban, J., *post*, at pp. 27–30 & fn. 9.) Making counties' constitutional authority subject to legislative definition would turn our home rule jurisprudence on its head and eviscerate these provisions.

employees," despite their express designation as such in section 31522.1. These personnel do not work for the county, the dissent suggests, but for entities that are distinct and independent from the counties they serve. (Dis. opn. of Groban, J., *post*, at pp. 27–29.) Like LACERA's argument to this effect in regard to Proposition 162, however, the dissent's position is based on language drawn from preclusion decisions that did not purport to decide which entity employs retirement system personnel. In each of the cited cases, individuals sought to bind retirement boards to a disability determination in their favor in workers' compensation proceedings. (See *Traub, supra*, 34 Cal.3d at pp. 797–798; *Preciado v. County of Ventura* (1982) 143 Cal.App.3d 783, 786; *Summerford v. Board of Retirement* (1977) 72 Cal.App.3d 128, 130; *Flaherty v. Board of Retirement* (1961) 198 Cal.App.2d 397, 401.) After a careful examination of the relevant facts, each case concluded the retirement board lacked an identity of interests sufficient to put it in privity with the county for preclusion purposes. (*Traub*, at pp. 798–799; *Preciado*, at pp. 787–789; *Summerford*, at pp. 131–132; *Flaherty*, at pp. 403–404.) The dissent's selective quoting from these cases fails to appreciate that a privity inquiry is highly contextual. " 'Whether someone is in privity with the actual parties requires close examination of the circumstances of each case.' " (*Victa v. Merle Norman Cosmetics, Inc.* (1993) 19 Cal.App.4th 454, 464.) Privity ultimately amounts to a " 'policy decision' " that the parties are sufficiently close that binding one to a judgment against the other does not offend due process. (*Gikas v. Zolin* (1993) 6 Cal.4th 841, 849.) The dissent's reliance on privity decisions elides this important context.

In a related point, the dissent appears to suggest that the staff of CERL retirement systems may have *never* been county employees, even before the enactment of section 31522.1. (See dis. opn. of Groban, J., *post*, at pp. 26–27, 29.) The argument is difficult to square with CERL's history. There is no dispute that county governments were responsible for appointing and compensating all "administrative staff" of CERL retirement systems before the passage of Assembly Bill No. 470. (Retirement Com., Analysis of Assem. Bill No. 470, *supra*, as introduced Feb. 26, 1973.) As LACERA's own briefing acknowledges, the bill "transfer[ed]" this authority to CERL retirement boards, to the dismay of many counties. No reason is apparent why such a transfer of control would have been necessary if the staff in question were already considered employees of their retirement systems, rather than the county.

Finally, we do not agree that the home rule provisions' significance can be dismissed because a county's participation in CERL is "entirely voluntary." (Dis. opn. of Groban, J., *post*, at p. 31.) While voluntary participation might foreclose some challenges,[26] it has no bearing on the specific issues here for the

---

[26] For example, the dissent argues statutes exempting some executive positions from civil service would be constitutionally suspect under our analysis. (See dis. opn. of Groban, J., *post*, at pp. 31–32.) Yet this legislation was supported, or at least not challenged, by the counties affected. (See Assem. Com. on Pub. Employees, Retirement & Social Security, Analysis of Assem. Bill No. 2655 (Reg. Sess. 1995–1996) as amended Apr. 18, 1996, p. 2 [listing San Diego County Board of Supervisors as supporting bill that enacted section 31522.3]; Assem. Com. on Pub. Employees, Retirement & Social Security, Analysis of Sen. Bill No. 1132 (Reg. Sess. 2001–2002) as amended Apr. 18, 2001, p. 2 [listing no opposition from County for bill that enacted

simple reason of timing. "Since 1937, Los Angeles County has participated in CERL," having opted into the scheme soon after its creation. (*Holmgren, supra,* 159 Cal.App.4th at p. 603.) But the Legislature did not enact section 31522.1 until 1973. By then, the County had been committed for more than 35 years to a statutory scheme that honored its home rule authority to set the compensation and civil service classification of county employees. Whether the Legislature could unilaterally strip the County of that authority raises a significant constitutional question.

"[W]herever possible, we will interpret a statute as consistent with applicable constitutional provisions, seeking to harmonize Constitution and statute." (*California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 594.) The County's interpretation best harmonizes section 31522.1 with the home rule provisions. The Legislature granted retirement boards the authority to hire all necessary staff, but it did not alter counties' constitutionally based power to decide their civil service classification and salary.

## C. *Policy Arguments*

Considerations of public policy also support our interpretation of the governing law.

LACERA's policy arguments focus on the assertion that, in order to run a successful fund, it must have the sole power to pay its employees whatever it determines is proper without "political meddling" from the County. However, this contention

_____

section 31522.4, exempting LACERA senior management].) The same cannot be said of Assembly Bill No. 470, which the County strenuously opposed.

ignores the nature of the institutions at play and their complex interrelationship. It bears emphasis that LACERA is not a private investment fund. It is a governmental entity, staffed by government employees. (§ 31522.1.) The distinction is consequential because a key feature of government employment in California is the civil service system. Except for a few positions designated unclassified, all state employees (see Cal. Const., art. VII, § 1) and all County employees (L.A. County Charter, § 33; see §§ 31100, et seq.) are explicitly made part of the civil service.[27] Accordingly, unlike private funds, LACERA's personnel decisions are constrained by civil service laws and principles.

The overall aim of the civil service laws is "to limit corruption and to promote efficiency and economy in state government." (*Westly, supra,* 105 Cal.App.4th at p. 1118.) The laws serve "a twofold purpose — 'to abolish the so-called spoils system' in the matter of appointment in the service and 'to increase the efficiency' of employees therein 'by assuring [them] of continuance in office regardless of what party may then be in power' together with the opportunity 'for promotion to higher positions when vacancies occur [as] the reward of faithful and honest' work." (*Almassy, supra,* 34 Cal.2d at p. 404.) This principle, requiring that appointments and promotions be based upon skills and performance, has been enshrined by voters in the Constitution. (*Pacific Legal Foundation, supra,* 29 Cal.3d at

---

[27] The Government Code does not impose its own civil service system but authorizes counties to create systems adaptable to their individual needs. (§ 31102.) The County did so, amending its charter to prescribe detailed civil service rules. (See L.A. County Charter, §§ 30–44.7.)

p. 174; see Cal. Const., art. VII, § 1, subd. (b).) In addition, the civil service statutes have enacted a related policy of "like pay for like work" (*California Attorneys*, *supra*, 174 Cal.App.4th at p. 436), under which "[p]ositions involving comparable duties and responsibilities are similarly classified and compensated" (§ 18500, subd. (c)(1)).

These are sound goals served by policies with a long history in California law. (See *Pacific Legal Foundation*, *supra*, 29 Cal.3d at pp. 181–182 [tracing civil service statutes back to 1913].) They promote a system that is fair to all employees and makes government employment achievable for a broad and inclusive part of the population. To further those goals, the County's Board of Supervisors sets civil service classifications for all classified positions, determines the salary levels for these positions based on the principle of equal pay for equal work, and formalizes these decisions in a salary ordinance. (L.A. County Charter, § 11.) In recognition of LACERA's specialized needs, the County is called upon to analyze comparable positions not only in County government but also in other retirement systems, including complex statewide systems such as CalPERS. LACERA now labels this approach "political." But maintaining salary alignment for comparable positions is a fundamental responsibility imposed on counties by the civil service laws. Indeed, as discussed, these laws were enacted for the very purpose of countering political corruption, arbitrary decision-making, and self-dealing in government employment. (See *Pacific Legal Foundation*, at pp. 182–185; *Almassy*, *supra*, 34 Cal.2d at p. 404.)

A contextual understanding of section 17 is necessary to preserve the important policies underlying the civil service laws.

LACERA's broad reading of section 17 would potentially override the civil service provisions applicable to state and county employment. Under LACERA's interpretation, retirement systems have "complete and absolute" authority over personnel decisions "subject *only* to the terms of Proposition 162 and judicial review." (*Los Angeles County Retirement*, *supra*, 102 Cal.App.5th at p. 1202, italics added.) If this is correct, it is not clear whether, or upon what basis, retirement systems could be required to adhere to applicable civil service laws. When this issue arose in *Westly*, the court resolved it by reaching an interpretation of section 17 that harmonized its grant of authority with article VII's civil service provisions. (See *Westly*, *supra*, 105 Cal.App.4th at p. 1113.) Adopting LACERA's contrary interpretation would nullify that holding and grant retirement systems carte blanche to evade civil service requirements any time it suits them. And there is no logical reason why the effects would be limited to statewide retirement systems. LACERA broadly stresses that it has plenary authority over staffing decisions "[n]otwithstanding any other provisions of law" (Cal. Const., art. XVI, § 17), which presumably includes CERL's directive that personnel appointed by a county retirement board "shall be county employees *and shall be subject to the county civil service or merit system rules*" (§ 31522.1, italics added). When pressed at oral argument on whether its interpretation of section 17 would override the civil service laws, LACERA's counsel responded that LACERA did not object to complying with these laws because it found them "compatible" with its operations. The response only begs the question of what would happen if at some point LACERA, or some other retirement system, no longer considers civil service

"compatible" with its business goals. The constitutional interpretation LACERA urges would allow it to evade civil service laws despite the Legislature's clear intention to the contrary.

A contextual understanding of county retirement boards' hiring authority also preserves the collaborative relationship outlined in CERL. The CERL statutes define an intricate system of checks and balances between these two government entities. As noted, roughly half of a retirement board's members are appointed by the county, and CERL requires that the county treasurer sit on the board as well. (§§ 31520, 31520.1.) In addition, the county's district attorney or county counsel serves as the retirement board's attorney absent a conflict of interest (§§ 31529, 31529.5), and the county's health officer must advise the retirement board on medical matters and attend board meetings upon request (§ 31530). Although a retirement board may make regulations for operating the system, these regulations are not effective until they are approved by the county's board of supervisors. (§ 31525; see *Rigley v. Board of Retirement* (1968) 260 Cal.App.2d 445, 450.) Finally, CERL gives counties an important degree of oversight of their retirement system's financial health. CERL retirement boards must conduct an audit of the system every year and file the report with the board of supervisors (§ 31593) along with a sworn statement regarding the system's financial condition (§ 31597). The county auditor also has a right to audit the retirement system's accounts if the board of supervisors so requests. (§ 31593.)

We emphasize that the statutes as a whole create a process based on interaction and cooperation. A CERL

78

retirement board discharges essential services by managing a county's pension fund and the operations of the retirement system to ensure members are properly served in a manner that is both fiscally sound and efficient. The retirement board brings its specialized understanding and expertise to the complex tasks entrusted to it. Membership on the board by county officers and appointees ensures that those participants are involved throughout the board's process of evaluating its needs. An amicus curiae brief filed by the California State Association of Counties (CSAC) observes that CERL creates a type of "meet-and-confer process" in which "the needs of both the retirement system and the county are taken into account."[28] This process "works well," according to CSAC, an observation supported by the long history of successful collaboration between LACERA and the County before the present dispute.

---

[28] The process begins when LACERA submits requests for classification and compensation levels for specific positions. The County's Chief Executive Officer reviews them in the same manner as requests concerning other County employment, evaluating their alignment with existing classifications and salary levels, including those within LACERA. The County also analyzes how the requests align with comparable positions in other CERL retirement systems, statewide systems such as CalPERS, and private sector employers. After further negotiations, as needed, the Board of Supervisors ultimately implements its final decisions in the County's salary ordinance. (§ 31522.1.) The dissent's concern that our decision would allow retirement boards to hire personnel only for existing positions is ill founded. (See dis. opn. of Groban, J., *post*, at p. 14, fn. 6.) We express no such limitation on retirement boards' appointment authority, nor does it appear that counties have attempted to impose such a limitation.

In contrast to the cooperative process urged by the County, and supported by the network of interrelationships outlined in CERL, LACERA asserts that retirement boards must have total and final control over these significant aspects of hiring, with counties obligated to rubber stamp their decisions. Such an interpretation would transform the system from one in which a retirement board recommends changes to one in which it is given unbridled authority to command them. LACERA contends such complete control is necessary in order to satisfy its fiduciary duties. But this argument "confuse[s] the measure of [a retirement board's] power with the reasonableness of its exercise of the power." (*Westly*, *supra*, 105 Cal.App.4th at p. 1114.) The fiduciary duties outlined in section 17, subdivisions (a) through (h) define how a retirement board's power must be exercised. They outline the scope of retirement board authority, constraining them from taking actions against the interest of plan participants. They are not a grant of power in themselves but a delineation of how that power is to be used.

LACERA's policy arguments do not persuade us to interpret Proposition 162 more broadly than the voters intended, or to upset the carefully calibrated legislative scheme that makes cooperation between retirement boards and county governments the default rule. We emphasize that voters or their representatives remain free to shift authority over compensation and classification decisions. Here, we simply hold that they have not done so to date, except as part of legislation enacted for specific counties. The arguments for such a change are more appropriately directed to the Legislature, which may systematically evaluate whether to change or make an exception to the default allocation of authority outlined in CERL. Indeed,

that is exactly the approach taken by the four county retirement
systems that have been specially designated as districts. The
retirement boards in these counties urged their need for greater
flexibility in attracting and retaining specialized talent, and
they obtained legislative solutions tailored to their particular
needs. In three of the counties, for example, only personnel
appointed to specific executive-level positions are designated
employees of the retirement system (§§ 31522.5, 31522.7,
31522.10–31522.11), whereas in Contra Costa County *all*
personnel are legislatively declared to be retirement system
employees and not county employees (§ 31522.9). On a
statewide level, CalPERS and CalSTRS obtained similar
legislation allowing them to fix the salaries of certain managers.
(See § 20098; see also *ante*, at p. 28, fn. 10.) The enactment of
these special exceptions demonstrates that legislative action is
available to make modifications based upon particularized
needs.[29] But the baseline system the Legislature enacted in

---

[29] The preference for tailored solutions led to the demise of a
proposed bill that would have extended essential provisions of
the county-specific statutes to *all* CERL retirement systems,
allowing them to elect to become districts with staff employed
by the retirement system instead of the county. (Legis.
Counsel's Dig., Assem. Bill No. 1853 (Reg. Sess. 2015–2016 Reg.
Sess.) pp. 2–4, 8–10.) In vetoing the bill, Governor Edmund G.
Brown, Jr., explained that allowing any CERL retirement board
"to unilaterally separate from the county" was "too far-
reaching." (Governor's veto message to Assem. on Assem. Bill
No. 1853 (Sept. 23, 2016) Recess J. No. 15 (2015–2016 Reg.
Sess.) p. 6632.) "Previous bills that [had] authorized a county
retirement system to become independent were the result of
agreement between the county and the retirement system."
(*Ibid*.) "This more collaborative approach," the governor
believed, "better serves the public interest." (*Ibid*.)

CERL, which Proposition 162 left undisturbed, is one of collaboration between county governments and their retirement boards.

D.  *Remedies*

Finally, it is important to note that this case deals only with the question of which body has ultimate authority over employee classification and salaries. This case comes to us because of a conflict between the two bodies in question, but neither party has focused on the appropriate framework for resolving such conflicts. The details of that framework are thus beyond the scope of the issues presently before us. We do, however, offer a few general observations.

The statutory framework makes clear that county power over retirement board staffing decisions is not unfettered. The obligation to work reasonably and collaboratively falls on both retirement boards and boards of supervisors. Such an approach allows decisionmaking informed by the retirement board's specialized expertise and the supervisors' obligation to operate the overall civil service system as the Constitution and applicable legislation requires. Section 31522.1 grants retirement boards the express authority to "appoint such administrative, technical, and clerical staff personnel as are required to accomplish the necessary work of the boards." What work is "necessary," and the staff needed to do it, are properly considered to fall within the retirement board's authority over system administration and service delivery. A county board of supervisors is not free to arbitrarily ignore or override a retirement board's reasonable decisions about the staff it needs to operate the retirement system and manage its investments effectively. If a county unreasonably rejects the retirement

board's recommendations, preventing appointments that "are required to accomplish the necessary work of the boards" (*ibid.*), judicial relief is available by writ of mandate (Code Civ. Proc., § 1085).

Mandamus lies not only to compel the performance of a ministerial duty, but also to correct a public official's abuse of discretion. (See *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442; *California Public Records Research, Inc. v. County of Stanislaus* (2016) 246 Cal.App.4th 1432, 1443.) Thus, although salary and classification decisions ultimately lie within a county's constitutional authority, they remain subject to judicial review for abuse of discretion. (See *Walker v. County of Los Angeles* (1961) 55 Cal.2d 626, 639 [holding courts have the power to strike down a salary ordinance that violates a city's charter]; *People ex rel. Harris v. Rizzo* (2013) 214 Cal.App.4th 921, 940–941 [same].) While a public entity enjoys considerable discretion in its legislative and quasi-legislative acts (such as salary setting), the court must still ensure that the entity "has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute." (*California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212 (*California Hotel*); see *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 577.)

Accordingly, a retirement board may seek mandamus review to challenge not only the *merits* of a county's classification or compensation decision but also the *process* by which that decision was reached. (*California Hotel*, *supra*, 25 Cal.3d at p. 212; see *Alameda Health System v. Alameda County Employees' Retirement Assn.* (2024) 100 Cal.App.5th 1159, 1177

[judicial inquiry encompasses " ' "whether the public entity's action . . . failed to conform to procedures required by law" ' "].) The collaborative scheme provided in CERL anticipates that the parties will engage in meaningful discussions in good faith. This deliberative process is essential for a county to make an informed exercise of its discretion. It contemplates that the board of supervisors will give due weight to a retirement board's explanation of why a different salary or classification is appropriate in light of the complexity of the tasks involved and the compensation required to hire and retain particularly qualified employees with specialized skills. A reviewing court may overturn a decision that is not the product of such good faith collaboration. In the alternative, if requested at the appropriate time, the court may order an uncooperative party to engage in the collaborative process that the Legislature has required.[30]

The County's 2021 refusal to implement certain classification and salary decisions for LACERA employees gave

---

[30] Consistent with its view that CERL gives retirement boards final authority over classification and salary setting, the dissenting opinion would put the onus on *counties* to seek writ relief if they object to these retirement board decisions. (Dis. opn. of Groban, J., *post*, at p. 42 & fn. 12.) Yet the dissent offers no satisfying explanation for why a county would have standing to obtain such relief when, according to the dissent's view of the law, counties have no say in retirement system staffing and merely a ministerial duty to rubber stamp the decisions of retirement boards. Under that view, establishing that counties have a beneficial interest sufficient to support standing seems a difficult task. Indeed, when asked about this possibility at oral argument, LACERA's own counsel responded that counties might not have standing to seek writ relief based on breach of fiduciary duty because LACERA owes a fiduciary duty to members, not the county.

rise to this lawsuit. But, as LACERA has framed its action, the legal argument concerns whether the County had the authority to make salary and classification decisions at all. Thus far, LACERA has not claimed the County abused its discretion when it acted in regard to some of the retirement board's particular recommendations. Instead, it has broadly argued throughout these proceedings that the County had no authority to refuse the retirement board's recommendations and was compelled to implement LACERA's decisions in their entirety. It is this legal assertion we have rejected. The nature of this litigation as it stands does not present the question of whether the Board of Supervisors acted unreasonably or improperly, or whether it properly exercised the power entrusted to it. Neither we, nor the courts below, have been called upon to examine whether the County's refusal to implement any specific personnel recommendation constituted an abuse of discretion. LACERA has made allegations suggesting the County may have done so. Now that the allocation of authority has been resolved, the trial court on remand may permit LACERA to amend its complaint and challenge any specific personnel decisions it urges were improper.

## III.  DISPOSITION

The Court of Appeal's decision is reversed.  On remand, the matter shall be returned to the trial court for it to reinstate its judgment.  Alternatively, the court may permit an amendment to the complaint or other proper continuation of this litigation in light of the clarification provided here.

**CORRIGAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**KRUGER, J.**
**SIMONS, J.***

_____
*       Associate Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

LOS ANGELES COUNTY EMPLOYEES RETIREMENT
ASSN. v. COUNTY OF LOS ANGELES

S286264


Dissenting Opinion by Justice Groban


In 1973, the Legislature passed Assembly Bill No. 470 (see Stats. 1973, ch. 269, §§ 1–2, p. 665 (Assembly Bill 470)), which fundamentally altered the administration of pension plans that operate under the 1937 County Employees Retirement Law. (CERL; Gov. Code, § 31450 et seq.)[1]  Prior to that time, counties typically chose the personnel necessary to administer CERL-governed retirement plans and allocated funds to pay those employees.  Assembly Bill 470 proposed adding two new sections to the Government Code that would change those practices. First, section 31522.1 would authorize retirement boards to "appoint such . . . personnel as are required to accomplish the necessary work of the boards."  Second, section 31580.2 would authorize retirement boards to adopt an annual budget for the costs of administering the retirement system.  The statute would further direct that those administrative costs were to be paid from retirement fund assets, subject to a spending cap of 1/10 of 1 percent of the fund.  Numerous counties opposed the legislation, arguing that these new provisions would leave counties with "no control" over retirement boards' personnel and spending decisions.  (See, e.g., James A. Hayes, Supervisor of the 4th District of the County of Los Angeles, letter to Governor

_____

[1]     Unless otherwise noted, all further statutory citations are to the Government Code.

1

Ronald Reagan, July 10, 1973; see also dis. opn., *post*, at pp. 16–17.) The Legislature ultimately rejected those critiques and Assembly Bill 470 became law.

Following the adoption of Assembly Bill 470, Los Angeles County (the County) and the Los Angeles County Employees Retirement Association (LACERA) agreed that sections 31522.1 and 31580.2 provided retirement boards authority to establish new classifications within the retirement system and to set the compensation of retirement system personnel. After almost 40 years of operating under that shared understanding, the County abruptly changed course and asserted that it had authority to veto the retirement boards' personnel decisions.

Today, the majority endorses the County's newly adopted interpretation of the law. More specifically, it concludes that despite vesting appointment and budgeting authority in the retirement boards, Assembly Bill 470's statutory provisions are nonetheless "most reasonably understood to mean that" the counties have final authority to decide what positions are necessary to administer the retirement system and how much those positions should be paid. (Maj. opn., *ante*, at p. 58.) I disagree with that interpretation, which effectively nullifies the very appointment and budgeting authority that Assembly Bill 470 intended to convey to the retirement boards.

I simply do not believe that a retirement board can have the statutory authority to "appoint such . . . personnel as are required" (§ 31522.1) to administer the retirement system but simultaneously lack the power to decide what positions are necessary to carry out those administrative duties. And I do not understand how a retirement board can have independent budgeting authority over "the entire expense of administration

2

of the retirement system" (§ 31580.2) but lack control over employee salaries, which is the system's single biggest expense. Moreover, adopting LACERA's interpretation does not withdraw the County's ability to influence these employment decisions. Far from it. The County's own appointees control a *majority* of the seats on LACERA's Board of Retirement, which reviews and approves personnel changes before they are ever submitted to the County's Board of Supervisors. Because I am unpersuaded by the majority's effort to address those concerns, I dissent.[2]

## I. BACKGROUND

### A. Relevant Provisions of CERL

Under CERL, "the management of the retirement system is vested in the board of retirement." (§ 31520.) This board is comprised of the county treasurer and either four or eight additional members. (See §§ 31520, 31520.1.) Half of those additional members are appointed by the county board of supervisors and the other half are elected by members of the retirement plan. (See §§ 31520; 31520.1.)[3] The structure of the

---

[2] Because I believe that the 1973 amendments to CERL are most reasonably construed as providing CERL-governed retirement boards authority over classification and salary decisions, I would decline to address whether the plenary authority set forth in The California Pension Protection Act of 1992 (Proposition 162) (see Ballot Pamp., Gen. Elec. (Nov. 3, 1992) text of Prop. 162, p. 70 et seq.) provides those boards (and presumably non-CERL governed retirement boards) constitutional authority over such decisions.

[3] For counties in which the assets of the retirement system exceed $800 million — which includes the County of Los Angeles — the board of supervisors may also establish a board of investments that is "responsible for all investments of the

board reflects a shared governance in which both the county and the retirement system members have a say in the management of the plan.

After CERL was enacted, counties typically decided what personnel they felt were necessary to administer the retirement systems. This was done by county treasurers and boards of supervisors. The counties were also responsible for allocating funds from the general fund to pay the administrative costs of the system. (See maj. opn., *ante*, at pp. 51–52.)

However, in 1973 Assembly Bill 470 added two new provisions that changed these practices. Newly added section 31522.1 assigned the retirement boards authority to "appoint such administrative, technical, and clerical staff personnel as are required to accomplish the necessary work of the boards." (Stats. 1973, ch. 269, § 1, p. 665.) The appointments were to "be made from eligible lists created in accordance with the civil service or merit system rules of the county in which the retirement system governed by the boards is situated. The personnel shall be subject to the county civil service or merit system rules and shall be included in the salary ordinance or resolution adopted by the board of supervisors for the compensation of county officers and employees." (*Ibid.*; see also maj. opn., *ante*, at pp. 52–53.) The last sentence of the statute was later amended to add language stating, "The personnel shall be *county employees and* subject to the county civil service

retirement system." (§ 31520.2, subd. (b).) Like the retirement board, the board of investments consists of the county treasurer, with the remaining positions being evenly divided between appointees of the county and appointees of the retirement plan. I collectively refer to the board of retirement and the board of investments as "the retirement boards."

or merit system rules." (Stats. 1979, ch. 55, § 1, p. 136, italics added; see maj. opn., *ante*, at p. 53.)

Assembly Bill 470 also added section 31580.2, which provides that when a retirement board chooses to exercise its appointment authority under section 31522.1, it must charge "the entire expense of administration of the retirement system . . . against the earnings of the retirement fund," subject to a spending cap of "one-tenth of 1 percent of the total assets."[4] (Former § 31580.2; Stats. 1973, ch. 269, § 2, p. 665.) The current version of section 31580.2 clarifies that retirement boards that choose to exercise their appointment power shall "annually adopt a budget covering the entire expense of administration of the retirement system," which is to be charged against the fund.

## B. LACERA's Historical Authority Over Personnel Decisions

### 1. *The County's original understanding of CERL*

In 1978, LACERA elected to exercise its appointment and budgeting authority under sections 31522.1 and 35280.1. (See maj. opn., *ante*, at p. 11.) From the time LACERA chose to exercise that authority until the current dispute arose some 40 years later, there does not appear to be any documented instance in which the County rejected a LACERA personnel request. Indeed, the record shows that throughout that time, the County agreed that: (1) LACERA's retirement boards had sole authority to create new classifications and set the salaries over those positions over personnel decisions; and (2) the County

---

[4] The spending cap has since been raised to "Twenty-one hundredths of 1 percent of the accrued actuarial liability of the retirement system." (§ 31580.2, subd. (a)(1).)

had a ministerial duty to implement any such requests in the county salary ordinance.

That understanding is memorialized in a formal opinion letter that County Counsel provided to the County's Chief Administrator Officer in 1996. In that letter, County Counsel agreed with an earlier analysis from LACERA's outside counsel (Morrison Foerster) concluding that sections 31522.1 and 31580.2 were most reasonably interpreted as assigning LACERA authority over classification and salary setting, subject only to judicial review. (County Counsel De Witt W. Clinton, letter to Los Angeles County Chief Administrative Officer Sally R. Reed, May 16, 1996 (1996 Opinion Letter).) County Counsel explained that while section 31522.1 "is silent with regard to the classification of LACERA employees, it does provide that the LACERA boards '*may appoint such . . . personnel as are required to accomplish the necessary work of the board.*' Since the LACERA boards are presumably in the best position to judge the types of employees necessary to accomplish their work, we believe that the Legislature intended to leave the question of classification up to them. They are also in the best position to determine the compensation levels necessary to recruit and retain qualified employees." (1996 Opinion Letter, italics added & underscoring omitted.)

County Counsel also noted that this reading was consistent with both section 31580.2, which delegated budgeting authority to the retirement boards, and the legislative history of Assembly Bill 470, which showed that the County had opposed the 1973 "legislation giving personnel and budget authority to LACERA and lost." (1996 Opinion Letter, *supra*.)

### 2. LACERA's submission of personnel requests

Under the parties' shared understanding of CERL, LACERA generally followed a two-step process when seeking a classification or salary change. First, retirement plan staff prepared an internal memorandum for the board of retirement (and where relevant the board of investment) describing the proposed personnel changes and the associated costs. Those memorandums explained the basis for the personnel changes and were often accompanied by "classification surveys, class studies and salary studies performed by outside consultants retained by LACERA." (Gregg Rademacher, LACERA Chief Executive Officer, letter to the Los Angeles County Board of Supervisors, April 15, 2010, at p. 1.) When new positions within the retirement system were being proposed, the memorandums contained a draft of the new classification that included a description of the job duties, the experience requirements and the relevant salary range.

If the retirement boards approved the personnel changes, LACERA prepared a memorandum for the County board of supervisors that explained the basis for the personnel changes and included a draft of an ordinance establishing the new classifications and salary ranges. The boards of supervisors would then adopt the ordinance, which the County viewed as a ministerial duty that it was statutorily compelled to perform. Upon ratification by the board of supervisors, the personnel changes were reflected in the County Salary Code, which includes a separate section that lists LACERA's personnel.

### C. The County's Change of Position

In 2018, that long-standing approach to retirement system personnel decisions abruptly changed when County Counsel

informed LACERA that the County no longer believed CERL provided retirement boards the authority to adopt new classifications and salaries. Repudiating its 1996 opinion letter (see dis. opn., *ante*, at p. 6), the County argued for the first time that it had constitutional authority over those personnel decisions because section 31522.1 states that retirement system appointees are "county employees." The County also argued that the views set forth in its 1996 opinion letter had been undermined by *Westly v. Board of Administration* (2003) 105 Cal.App.4th 1095, which held that Proposition 162 did not give CalPERS authority to exempt its employees from civil service or to take various other personnel actions that were in conflict with state law. (See maj. opn., *ante*, at pp. 27–28.) The County did not explain why *Westly*, a case that had been decided some 15 years earlier and that did not implicate CERL, had suddenly caused it to reinterpret sections 31522.1 and 31580.2.[5]

Shortly after notifying LACERA that its views had changed, the County rejected several LACERA personnel

---

[5] The majority questions whether the County truly deferred to LACERA's personnel decisions during the four decades that preceded the current dispute, contending that "the record does not support this assertion." (Maj. opn., *ante*, at p. 11, fn. 6.) However, throughout these proceedings LACERA has consistently (and explicitly) argued that "[f]or decades the County recognized LACERA's authority under CERL . . . to appoint and set salaries for its personnel, but this changed in or around 2017." Notably, the County *has never disputed those claims* nor has the County identified a single instance in which it denied or even disagreed with a LACERA personnel request prior to the current dispute. If the County believed that LACERA had misrepresented the parties' past practices, I would expect it would have said as much at some point in this long-running litigation.

requests, which included various new management positions, a new information technology department and several salary amendments. LACERA believed that the new classifications were needed to "develop[], implement[], and manage[]" LACERA's increasingly "complex[] . . . operations." (Robert Hill, LACERA Interim Chief Executive Officer, letter to the County of Los Angeles Board of Supervisors, May 29, 2018, at p. 2.) A new deputy chief investment officer (DCIO), for example, would facilitate "long term strategic planning" for LACERA's expanding investment portfolio and a new principal chief counsel would enable the Chief Counsel "to devote more time to governance, strategic, and compliance issues." (Gregg Rademacher, LACERA Chief Executive Officer, letter to LACERA Operations Oversight Committee, January 20, 2017, at p. 3.)

In response to these requests, County Chief Executive Officer Sachi Hamai prepared his own analysis of the personnel changes and recommended that the board of supervisors reject many of them. While acknowledging that LACERA's proposed personnel changes were the product of an extensive management study that had been conducted by outside consultants, Hamai did not see the "benefits of adding" several of the new positions, including a DCIO or a principal chief counsel. (Sachi A. Hamai, Los Angeles County Chief Executive Officer, letter to the Los Angeles County Board of Supervisors, May 29, 2018, attachment, at p. 2; see *id*. at p. 3.) In support, Hamai argued that other county retirement systems did not have analogous positions. Hamai's analysis did not provide any information as to whether those other systems were comparable in size or complexity to LACERA, which is the largest county retirement system in the United States. Hamai was likewise of

the view that the "the size of [LACERA's] Legal Services Division" did not support a principal chief counsel position. (Hamai Letter, at p. 3.)

When LACERA renewed its request for a DCIO, the County again denied approval, explaining that the level of compensation LACERA had proposed for the position exceeded the salaries of personnel who held analogous roles within other county agencies. The County further explained that while LACERA "typically compares itself with other retirement systems such as CalPERS," the County believed that "when allocating positions and appropriate salary levels, internal alignment with other County departments is important. We must strike a balance between external market factors and internal equity considerations." (Ann Havens, Acting Senior Manager and CEO of the Los Angeles County Classification and Compensation Division, letter to Carly Ntoya, LACERA Director of Human Resources, January 19, 2021, at p 2.)

Over the next several years, LACERA and the County continued to disagree about the necessity of various classification and salary requests, culminating in the current suit.

## II.   DISCUSSION

The question in this case is whether CERL — and in particular sections 31552.1 and 31580.2 — authorize retirement boards to establish new classifications and salary ranges for retirement system personnel or whether counties have that authority.

The majority concludes that those provisions are reasonably susceptible to multiple interpretations. The first interpretation is that the retirement boards' appointment and

budgeting authority "necessarily includes the power" to establish new positions (i.e., classifications) and to set the salaries of their personnel. (Maj. opn., *ante*, at p. 54.) The second reading is that the statutes authorize retirement boards to make *recommendations* regarding classifications and salary ranges, but counties have discretionary authority to deny those recommendations. As discussed in more detail below, this second reading is premised primarily on the fact that section 31522.1 describes retirement personnel as "county employees." (See maj. opn., *ante*, at pp. 57–58; see also *id*. at pp. 70–74.)

The majority concludes the second interpretation provides the most plausible reading of the statutory language. I disagree. Like the Court of Appeal, I believe that the Legislature's 1973 amendments were intended to assign classification and salary setting authority to the retirement boards, which accords with how the County read the statutory language for almost four decades. In my view, having independent authority over the appointment of personnel and budgeting would mean very little without having the ability to establish new positions and set the compensation level of retirement system personnel.

## A. CERL Assigns Retirement Boards Authority Over Personnel decisions

### 1. *The text of CERL*

I begin with the language of CERL. (See *Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142, 1147 ["Statutory interpretation begins with an analysis of the statutory language"].) Section 31520 expressly provides that "the management of the retirement system is vested *in the board of retirement*." (§ 31520, italics added.) Section 31522.1 states that *the retirement boards* "may appoint such

administrative, technical, and clerical staff personnel as are required to accomplish the necessary work of the boards." And section 31580.2, subdivision (a) assigns *the retirement boards* the authority to "annually adopt a budget covering the entire expense of administration," which is to be charged against the plan itself. Those annual expenditures are subject to a spending cap that is specified as a percentage of the assets of the fund. Thus, CERL expressly assigns the retirement boards, and not the counties, the authority to *manage* the retirement system, to *appoint* the personnel it deems necessary to carry out those managerial duties, to set the *budget* for administering the fund, and to pay those administrative costs from the fund itself.

Considered together, I believe those broad delegations of power are most reasonably construed as assigning retirement boards authority to establish new classifications, which amount to new positions of employment within the retirement system. To conclude otherwise would effectively nullify the appointment authority described in section 31522.1. Again, that provision assigns *the retirement boards* authority to "appoint such . . . personnel as are required to accomplish the necessary work of the boards." (§ 31522.1.) Allowing counties to veto positions that the retirement boards have concluded are necessary to carry out their duties would turn that provision on its head.

The facts of this case are illustrative. After conducting a detailed study with the aid of outside consultants, LACERA's boards determined that they needed to appoint several new positions to properly manage their increasingly complex investment portfolio. The County, however, did not believe those new positions were adequately beneficial and refused to adopt the classifications. I find that outcome very difficult to square with statutory language that expressly vests *the*

*retirement boards* with authority to "manage[]" the retirement system (§ 31520) and to "appoint" such staff as they believe are "required" to carry out those duties (§ 31522.1).

I likewise find it difficult to square section 31580.2's broad delegation of budgetary authority with the majority's conclusion that the counties have final authority over the salaries of retirement system personnel. Section 31580.2, subdivision (a) not only authorizes retirement boards to adopt a budget covering the "entire expense" of administering the system but also directs that such expenditures are to be paid by from the plan's assets (not the county general fund) and sets an annual spending limit. I believe that these elements of section 31580.2 show that the Legislature intended to give the retirement boards discretionary authority to decide how much to spend on administering the plan, subject to the spending limit. Not surprisingly, LACERA's primary administrative expenditure is employee salaries, which comprise nearly *three-quarters* of the annual budget. As explained by the Court of Appeal, the assertion that "the Legislature gave retirement boards authority to set their own budgets and hire their own employees so long as they paid those employees from system assets, yet silently reserved for county administrators the right to veto the vast majority of that spending, is inconsistent with retirement boards having the ability to create, fund, and control their own budgets." (*Los Angeles County Employees Retirement Assn. v. County of Los Angeles* (2024) 102 Cal.App.5th 1167, 1220–1221 (*LACERA*).)

The majority does not explain how the retirement boards can be expected to appoint the personnel necessary to administer the retirement system without having the power to decide what positions are in fact necessary to carry out those

duties. Nor does it explain how the retirement boards can have independent budgeting authority over "the entire expense of administration" but lack control over the system's most significant expense. Instead, the majority reads language into the statute that is not in the text, construing sections 31522.1 and 31580.2 as merely " 'permit[ting retirement boards] to make *recommendations* to the [b]oard of [s]upervisors' " regarding classifications and employee compensation. (Maj. opn., *ante*, at p. 14.) But section 31522.1 does not say that retirement boards may make personnel *recommendations* to the county. Rather, the statute says that retirement boards may "*appoint*" such personnel as are required to carry out their work.[6] (§ 31522.1, italics added.) Similarly, section 31580.2 does not say that retirement boards may make *recommendations* to the county regarding expenditures. It states that the retirement boards "shall annually adopt a budget covering *the entire expense of*

---

[6] At times, the majority also appears to argue that section 31522.1's appointments clause might be read to merely allow retirement boards to "hire" personnel into existing classifications (i.e., existing positions) but does not authorize them to establish new positions. (Maj. opn., *ante*, at pp. 2, 47, 50.) The entirety of the appointments clause, however, states that the retirement boards may "appoint such administrative, technical, and clerical staff personnel *as are required to accomplish the necessary work of the boards*." (§ 31522.1, italics added.) In my view, that language clearly suggests that the boards have authority to decide not only *who to hire* but also to determine what positions are "required to accomplish the necessary work of the boards." (*Ibid*.) Again, if the Legislature's intent were merely to allow the boards to choose candidates to fill open positions, it could have said as much. By authorizing the boards to appoint such personnel as are required to accomplish the necessary work of the retirement system, the Legislature signaled a broader intent.

*administration of the retirement system*," subject only to a spending cap.  (§ 31580.2, subd. (a), italics added.)

If the Legislature had merely intended to allow retirement boards to make recommendations to the county regarding appointments and expenditures, it could have easily said as much.  Alternatively, it could have included language indicating that the retirement boards' appointments and spending decisions were subject to the approval of the county.  But the statutes include no such limitation.  Instead, the only limitation the Legislature placed on the retirement boards' appointment and budgeting authority was a spending cap that limited their total expenditures to 1/10 of 1 percent of the fund's assets.  (See stats. 1973, ch. 269, § 2, p. 665.)

### 2.  *Legislative history*

LACERA's reading of CERL finds substantial support in the legislative history of Assembly Bill 470, which added sections 31522.1 and 31580.2.  The Assembly Retirement Committee's bill analysis explained that under then existing law, "the administrative staff available to a [CERL] retirement board is responsible to the [c]ounty," and the boards of supervisors are required to "appropriate annually . . . sufficient money to offset the administrative cost of the county's retirement system."  (Assem. Retirement Com. Bill Analysis of Assem. Bill No. 470 (1973–1974 Reg. Sess.), at p. 1 (Assem. Retirement Com. Analysis.)  According to the analysis, the proposed bill would alter those procedures by allowing retirement boards "to appoint [their] own administrative, technical and clerical staff" and charge those administrative costs against the earnings of the retirement fund.  (*Ibid.*)

The Assembly Retirement Committee's bill analysis noted that the County opposed the legislation and included a copy of a letter from Los Angeles County Treasurer and Tax Collector Harold Ostly. (Assem. Retirement Com. analysis, *supra*, p. 1.) Ostly's letter argued that retirement board members lacked the "expertise" to decide what personnel were necessary to administer the retirement system and contended that county treasurers were better equipped to carry out such duties. (Harold J. Ostly, County of Los Angeles Office of the Treasurer and Tax Collector, letter to Assemblyman Bob Wilson, Apr. 17, 1973, at p. 1 (Ostly Letter).) Ostly also argued that the proposed bill would effectively "create . . . new units of county government with no cost controls as we now know them in county operations other than the limiting feature of 1/l0th of 1% of the total assets." (*Ibid.*) To remedy these perceived harms, Ostly's letter proposed that section 31522.1 be amended to state that "*The county treasurer* may appoint such . . . personnel as are required to carry out the necessary work" of the retirement boards and further proposed that section 31580.2 be amended to assign budgeting authority to the county. (Ostly Letter, at p. 1, italics added.) Those amendments were rejected.

Numerous other counties with CERL-governed retirement systems raised similar concerns. The Treasurer for Sacramento County, for example, explained that it was "one of several counties which has opposed this bill on the basis that no county board should be allowed to appoint staff without being subject to the budgetary control of the Board of Supervisors." (H.B. Alvord, Sacramento County Treasurer-Tax Collector, letter to Governor Ronald Reagan, July 3, 1973 (Alvord Letter); see *Harrott v. County of Kings* (2001) 25 Cal.4th 1138, 1162, fn. 4 [considering letters to the governor that were "consistent with

the legislative language and history"].)  The letter contended
that Assembly Bill 470 "would be similar in effect to the [federal
government] passing a bill allowing the Public Employees
Retirement System to make expenditures from out of public
employees retirement funds without any budgetary control of
the State."  (Alvord Letter.)  The County of Orange argued that
the bill would leave county treasurers with "no control of [the
pension plan's] administration" (Robert L. Citron, County of
Orange Tax Collector-Treasurer, letter to Governor Ronald
Regan, July 6, 1973), while the County of Mendocino complained
that it would "completely remove[]" all "[b]udgetar[y]
responsibilities . . . from the Board of Supervisors which is . . .
contrary to good administrative policies."  (Sam Ray, Jr.,
Retirement Administrator of County of Mendicino Employees
Retirement Association, letter to Governor Ronald Reagan, July
5, 1973.)  The counties of Kern, Alameda, Marin and others
likewise voiced objections regarding the lack of control that
boards of supervisors would have over the retirement system.

In my view, the letter from Treasurer Ostly (which was
expressly discussed and attached to the Retirement
Committee's bill analysis) and the other letters from county
administrators contradict the majority's assertion that "nothing
in the legislative history" (maj. opn., *ante*, at p. 64) suggests that
the proposed bill would withdraw the counties' "classification
and salary-setting authority over retirement system personnel."
(*Ibid.*)  Ostly's complaint that county treasurers, not retirement
boards, were in the best position to evaluate what personnel
were necessary to administer the retirement system would
make little sense if he believed that the bill would allow counties

17

to override retirement board personnel decisions.[7]   And the complaint that the legislation would leave the county with "no cost controls" (Ostly Letter, *supra*, at p. 2) over retirement boards apart from the statutory spending cap would make little sense if the counties believed that the county would retain approval authority over the salaries of retirement system personnel, which comprises a vast majority of the system's budget.

It also bears emphasizing that the Legislature *rejected* a proposal from Los Angeles County Treasurer Ostly that the text of sections 31522.1 and 31580.2 be amended to assign county treasurers appointment and budgeting authority.  In light of that history, Ostly would no doubt be both pleased and surprised by the majority's reading of CERL, which effectively imposes the very amendments to sections 31522.1 and 31580.2 that he had unsuccessfully lobbied for in 1973.

The majority takes a different view of the legislative history by focusing on a single passage in a single enrolled bill report that states:  "Apparently, appointment of [retirement system] employees falls within the jurisdiction of the Board of Supervisors as in other county departments.  The bill would vest such appointing authority in the two administrative boards

---

[7]    The majority contends that the letter from Ostly cannot be fairly construed as arguing that that retirement board members lacked the expertise to decide what personnel were necessary to administer the retirement system. (See maj. opn., *ante*, at p. 65, fn. 21.)  But Ostly's letter specifically states that retirement board members and investment board members are elected "for their expertise in matters of benefits and investments, *not . . . for their administrative background*."  (Ostly Letter, *supra*, at p. 1, italics added.)

*subject however, to county civil service and salary fixing
authority.*" (Agriculture and Services Agency, Enrolled Bill Rep.
on Assem. Bill 470 (1973–1974 Reg. Sess.) July 5, 1973, italics
added.) According to the majority, "[t]his report thus confirmed
that . . . the bill would preserve counties' traditional 'salary
fixing authority.' " (Maj. opn., *ante*, at p. 64.)

Enrolled bill reports are prepared by executive branch
personnel *after* the bill has passed both houses of the legislature.
(See *In re Lucas* (2012) 53 Cal.4th 839, 855, fn. 13.) It is exactly
for that reason that we place little weight on such reports (see
*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1218, fn. 3)
and will generally consider them only when they "reflect[] the
same understanding" that is shown in other legislative
materials. (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 934.) In this
case, there is not another statement anywhere in the legislative
history suggesting that Assembly Bill 470 would leave salary-
setting in the control of the counties. Moreover, the enrolled bill
report's isolated statement to that that effect appears to conflict
with the arguments in opposition to the bill that were detailed
in the Assembly Retirement Committee's analysis, which
complained that the legislation would leave counties with "no
cost controls" (Ostly Letter, *supra*, at p. 1) over the
administration of retirement board system. (See *Whitley*, at
p. 1218, fn. 3 [enrolled bill reports "certainly do not take
precedence over more direct windows into legislative intent such
as committee analyses"].)

## B. The Majority's Analysis

### 1. *Application of the home rule*

The majority's statutory analysis largely sidesteps
language in sections 31522.1 and 31580.2 that expressly

delegates appointment and budgeting authority to the retirement boards. Instead, the majority adopts the County's argument that CERL provides counties "home rule" authority over retirement system staff, which necessarily includes the power to approve (and reject) classification and salary requests. (See maj. opn., *ante*, at pp. 57–59, 70–74.)

### a. *Designation of retirement personnel as "county employees"*

The majority's home rule arguments initially focus on section 31522.1's directive that retirement system personnel appointed by the retirement boards "shall be county employees." According to the majority, this language shows that the Legislature intended that these personnel would be subject to constitutional home rule provisions that assign county boards of supervisors the "authority to appoint and fix the compensation of all County employees." (Maj. opn., *ante*, at p. 15; see *id.* at p. 49 [§ 31522.1 "directs that retirement system personnel are county employees subject to the county's [constitutional] salary-fixing authority"].)

The County's own 1996 opinion letter expressly rejected that reading of section 31522.1, explaining: "LACERA employees are not County employees in any general sense. They are not County employees by virtue of the County Charter, which requires the Board of Supervisors to provide for the number, classification, compensation, and appointment of County employees . . . . Rather, LACERA employees are made County employees by statute for rather limited purposes primarily relating to the manner of their appointment and their tenure [i.e., civil service protections] . . . [and] to allow them to participate in the retirement system." (1996 Opinion Letter, *supra*.)

20

There are several reasons why I find the County's prior interpretation of the phrase "county employees" more convincing than the interpretation it (and the majority) embrace today. As a starting point, the fact that section 31522.1 expressly authorizes retirement boards to "*appoint*" (italics added) retirement system personnel casts significant doubt on the idea that the phrase "county employees" was meant to signify that such personnel are subject to the home rule provisions. Among the powers listed in those home rule provisions is the " '*appointment*' " of county employees. (Maj. opn., *ante*, at p. 17 [" 'Under the "home rule" doctrine, . . . the county's right to provide "for the number, compensation, tenure, *and appointment* of employees" . . .' take precedence over conflicting state laws"], italics added; see Cal. Const., art. XI, § 1, subd. (b) [county boards of supervisors shall "provide for the number, compensation, tenure, and *appointment* of [county employees]"], italics added]; see also § 25300 [boards of supervisors "shall provide for the . . . *appointment* . . . of county employees"], italics added].) If the Legislature truly intended for retirement system staff to be subject to home rule authority, it seems quite odd that it would assign retirement boards one of the powers that the home rule expressly delegates *to counties*.

The majority's interpretation is further undermined by other sections of CERL that use the phrase "county employee" to describe certain categories of retirement system staff who do *not* appear to be subject to home rule authority. Section 31522.4, for example, authorizes LACERA to appoint various classes of senior retirement system staff. Like section 31522.1, the statute directs that persons appointed under this statute "shall be county employees" and "shall be included in the salary ordinance." (§ 31522.4, subd. (a).) Unlike section 31522.1,

however, the statute states that these appointees shall be exempt from civil service rules and are deemed to "serve at the pleasure of, and may be dismissed at the will of, the appointing board or boards." (§ 31522.4, subd. (a).) That delegation of authority is in obvious conflict with the home rule provisions, which assign counties authority to determine the "tenure" (Cal. Const., art. XI, § 1, subd. (b)) and "manner of . . . removal" of county employees (*id*. at § 4, subd. (f)). Clearly then, the term "county employee" as used in section 31522.4 does not mean that the county has home rule authority over persons appointed under that statute. Section 31522.3, subdivision (a) contains identical provisions regarding the appointment of certain classes of retirement staff in other counties. The fact that sections 31522.3 and 31522.4 use the phrase "county employee" to describe classes of retirement system staff who are not subject to the home rule casts doubt on the majority's conclusion that the use of that same phrase in section 31522.1 *is* intended to signify that such personnel are subject to the home rule. (See *People v. Jones* (1988) 46 Cal.3d 585, 595 [" 'It is presumed . . . that a repeated phrase or word in a statute is used in the same sense throughout' "].)

The majority's suggestion that the use of the phrase "county employees" was meant to make retirement system personnel subject to the home rule provisions would also effectively render meaningless section 31522.1's requirement that the appointments "shall be included in the salary ordinance or resolution adopted by the board of supervisors for the compensation of county officers and employees." As the majority acknowledges, if retirement system personnel were truly intended to be "county employees" for purposes of the home rule, counties would already have a mandatory constitutional (and

statutory) duty to include these personnel in the salary ordinance. (See maj. opn., *ante*, at p. 56; Cal. Const., art. XI, §§ 1, subd. (b), 4, subd. (f); Gov. Code, § 25300.) Thus, there would have been no need for section 31522.1's directive that such personnel shall be included in the salary ordinance, which would be redundant of those preexisting obligations. (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1010 ["we have [repeatedly] stressed . . . [that] interpretations that render statutory terms meaningless as surplusage are to be avoided"].)

In an attempt to ascribe meaning to section 31522.1's requirement that retirement board appointments shall be included in the salary ordinance, the majority concludes that this language is "consistent" with the requirement that county employees' "salaries must be prescribed by ordinance according to longstanding constitutional and statutory provisions." (Maj. opn., *ante*, at p. 56.) But under the majority's interpretation, section 31522.1's directive is not merely "consistent" with those "longstanding" constitutional requirements but is *entirely duplicative of them*. For this reason, the majority's reasoning still renders this language surplusage.

In a further attempt to give the language meaning, the majority argues that while "applicable law does appear to require the inclusion of county employees' compensation in a salary ordinance or resolution" (maj. opn., *ante*, at p. 57, fn. 19), the Legislature may have nonetheless been concerned that courts would not construe those other sources of law as imposing such a requirement. In my view, that is a highly unlikely explanation given that the Constitution includes clear and unambiguous language that has long been understood to impose those duties. (See *id.* at p. 56.)

Finally, the majority's interpretation might be more persuasive if there were no other logical reason why the Legislature might have chosen to add language describing section 31522.1 appointees as "county employees." But the history of CERL provides a ready explanation for that addition. Section 31469 defines the term "employee" for purposes of CERL to mean any officer or person *employed by a county* whose compensation is fixed by the board of supervisors[,] or by statute[,] and whose compensation is paid by the county." (§ 31469, subd. (a), italics added.) As the majority explains, "Section 31469's definition is important because it identifies the public employees who are eligible to participate in a CERL system" and thus "entitled to CERL pension benefits." (Maj. opn., *ante*, at p. 51.) However, after the 1973 amendments, it was no longer clear whether persons who were appointed by the retirement boards under section 31522.1 and whose compensation was paid from the pension plan assets under section 31580.2 were still "employed by the county" within the meaning of section 31469, subdivision (a) (and thus eligible to participate in the retirement system). (See maj. opn., *ante*, at pp. 61–62; see also Contra Costa County Retirement Administrator Benjamin O. Russel, letter to Barry Brokaw, Administrative Assistant to Assemblyman Daniel Boatright, Mar. 12, 1979 (Russell Letter) [explaining that "a question has been raised [by some county officials] on whether the employees [appointed under § 31522.1] would" be county employees].) The addition of the phrase "county employees" remedied that confusion.

As the majority acknowledges, there is very little legislative history explaining why the term "county employees" was added to section 31522.1. This amendment was added in

1979 as part of Assembly Bill 132 (Reg. Sess. 1978–1979), which also raised the spending cap on retirement boards' budgeting authority. (See stats. 1979, ch. 55, §§ 1, 2, p. 136.) Almost all of the legislative history focuses on that portion of the bill. The only substantive discussion of the "county employee" language is in a letter from the Contra Costa County Treasurer who proposed making that change. The letter explained to the bill's sponsor (Assemblyman Daniel Boatwright) that the addition of "[c]ounty employees" was intended to "make[] it clear that the staff of the Retirement Association continues to be county employees," which was "declaratory of existing law." (Russell Letter, *supra*.)

The majority concludes from this history that the amendment was meant to reaffirm that "the Legislature has always, and continues to, regard retirement system staff as county employees, subject to the county's" classification and salary-fixing authority under the home rule. (Maj. opn., *ante*, at p. 63.) But as the majority itself acknowledges, the purpose of the amendment appears to have been to ensure that retirement system personnel remained "employees" *within the meaning of CERL*. (See maj. opn., *ante*, at pp. 61–62.) In light of that purpose, it is reasonable to read that provision not as transforming such personnel into county employees for all conceivable purposes, but rather to clarify that they remained employees for purposes of section 31469.[8]

---

[8] This reading finds further support in provisions of CERL that, as discussed above, allow the retirement boards in some counties to appoint executive personnel who serve at the will of the retirement boards. (See dis. opn., *ante*, at pp. 21–22). While those executives do not appear to be subject to home rule authority, they are nonetheless described as "county employees"

I view that narrow interpretation of the 1979 amendment to be more persuasive than the far broader reading proposed by the majority. In the end, I find it unlikely that despite having expressly assigned the retirement boards authority to appoint their own staff and set their own budgets, the Legislature's inclusion of the term "county employees" was meant to ensure that the county retains final say over the retirement personnel appointments and expenditures related to salary. If that were truly the Legislature's intention, I would think they would have said so expressly.

### b. *LACERA's interpretation of section 31522.1 does not violate the home rule provisions*

In a variation on its argument that section 31522.1's description of retirement system staff as "county employees" shows that the Legislature intended that these personnel would be subject to home rule authority, the majority argues that it would likely *violate* the constitutional home rule provisions to interpret the statute any other way. (See maj. opn., *ante*, at pp. 70–74.) As I understand it, in an argument that not even the County has made, the majority's position is that when CERL was enacted in 1937, it was the intent of the Legislature that retirement system personnel would be treated as county employees for purposes of the home rule. And because they

---

who must be included in the county salary ordinance. (See *ibid.*) Thus, the only apparent purpose of describing them as "county employees" is, as stated by the majority, to ensure that those personnel fall within "CERL's definition of an ' "[e]mployee" ' [who is] eligible to receive retirement benefits." (Maj. opn., *ante*, at pp. 56–57, fn. 19.) In my view, the use of that identical language in section 31522.1 is most reasonably construed as serving the same purpose.

26

qualified as home rule county employees in 1937, it would have been unconstitutional for the Legislature to "unilaterally revoke" (maj. opn., *ante*, at p. 71) that home rule authority when it enacted Senate Bill 470 in 1973. That line of reasoning, however, is predicated on the assumption that retirement board staff were county employees for purposes of the home rule *prior* to section 31522.1's passage — presumably since the time of CERL's enactment. But the majority does not fully explain how it concludes that this was the original intent of the Legislature when CERL was adopted in 1937.

In my view, there are significant reasons to doubt the majority's conclusion. To begin with, the majority has not identified any provision in the original version of CERL stating (or even suggesting) that personnel who aid the retirement board in managing the retirement system are subject to home-rule authority. Indeed, the original version of CERL appears to be entirely silent about retirement system staff. As the majority notes, without any statutory guidance on the issue, it appears that some counties chose to appoint county employees to aid the retirement boards in their administrative duties. But that practice does not seem to have derived from any provision in CERL itself. I fail to see how the counties' voluntary decision to appoint county employees to aid the retirement boards in their work shows that the Legislature always intended that any CERL-governed retirement system staff would fall under the counties' home-rule control.

The idea that the Legislature always intended that retirement board personnel would be subject to home rule authority is further undermined by well-established case law recognizing that retirement boards are not "agent[s] for the county," but rather serve as "independent entit[ies] established

pursuant to the [CERL]." (*Traub v. Board of Retirement* (1983) 34 Cal.3d 793, 798 (*Traub*); see maj. opn., *ante*, at p. 8 ["Despite . . . ties to county government, a CERL retirement board is not a mere agent of the county. A retirement board is . . . 'an independent entity' [citation] with a 'distinctive identity, constituency and interests' "].) In *Traub* we explained that retirement boards have interests that are "distinct[]" from those of the county and have a "constituency [that] is not limited to county employees, but [rather extends to] . . . employees of various political subdivisions and districts" that are unaffiliated with the county. (*Traub*, at pp. 798, 799.) Prior to our decision in *Traub*, an unbroken line of authority from our Courts of Appeal had likewise concluded that "retirement associations created under [CERL] are organizations totally 'distinct from the county.' " (*Summerford v. Board of Retirement* (1977) 72 Cal.App.3d 128, 132, quoting *Flaherty v. Board of Retirement* (1961) 198 Cal.App.2d 397, 404; see *Preciado v. County of Ventura* (1983) 143 Cal.App.3d 783; 788 ["An association formed under [CERL] is separate and distinct from the county"].) In the absence of any provision explicitly stating as much, I am dubious that the Legislature intended to give counties home rule authority over the staff of a statutorily created, independent agency that has interests that are distinct from those of the county and that serve a constituency beyond the county itself.

The majority attempts to downplay the significance of the well-established line of authority holding that CERL-governed retirement boards are (and have always been understood to be) independent agencies by arguing that those cases merely held that privity does not exist between a retirement board and a county. I read *Traub* differently. *Traub* did not merely hold that a retirement board has "independence from the county for

[purposes of] privity." (Maj. opn., *ante,* at p. 45.) Rather, *Traub* held that privity between the retirement board and the county was lacking *because a CERL-governed retirement board is an independent entity,* with an "identity [and] . . . interests" that are "distinct[]" from the county itself. (*Traub*, *supra*, 34 Cal.3d at p. 799.) Stated differently, the "contextual" " 'circumstances' " (maj. opn., *ante,* at p. 72) we relied on in finding a lack of privity *was the fact of the retirement board's status as an independent agency*.

The majority's suggestion that it was always understood that CERL gave counties home rule authority over retirement system staff also overlooks that the policy rationale underlying the home rule is largely absent here. The general purpose of the home rule is to protect " 'the right of the populace of a local area to create . . . their own local governments . . . and prevent interference by the state government with what they have created.' " (*Younger v. Board of Supervisors* (1979) 93 Cal.App.3d 864, 869; see *Ex Parte Braun* (1903) 141 Cal. 204, 209 ["the object of the [home rule] amendment was to . . . deprive the legislature of the power, by laws general in form, to interfere in the government and management of the municipality"].) CERL, however, established an *optional* employee pension system that counties were given *the choice* of adopting. Under the structure of CERL, the retirement boards are independent entities that are (and have always been) vested with the authority to "manage[] . . . the retirement system." (§ 31520; see stats. 1937, ch. 677, § 55, p. 1903.) The majority has not identified any provision in the 1937 enactment suggesting that, despite their status as independent agencies with managerial control of the pensions system, any persons carrying out the

functions of the retirement boards would necessarily be treated as county employees subject to the home rule.[9]

---

[9] The majority argues that it is immaterial whether any provision in CERL provided that retirement board staff would serve as county employees because the home rule "derive[s]" "not from CERL," but "from article XI of the Constitution." (Maj. opn., *ante*, at p. 71, fn. 25; see *ibid.* [application of home rule does not turn on whether the Legislature "saw fit" to "define" retirement board staff as "county employees"].) But it is undisputed that the home rule only applies to personnel who are in fact employees of the county. If CERL never intended that retirement board staff were to be treated as employees of the county for purposes of the home rule it is unclear why the home rule would ever apply. Thus, to determine whether the home rule applies, we must necessarily look *at the provisions of CERL* itself.

This approach does not "turn our home rule jurisprudence on its head and eviscerate these provisions." (Maj. opn., *ante*, at p. 71, fn. 25.) As explained above, the purpose of the home rule is to prevent the state from interfering in county governance. (See dis. opn., *ante*, at p. 29.) In this case, the state did not *require* that counties run their retirement systems in any specific way. Instead, CERL offered the counties *the option* of adopting *entirely voluntary* rules and regulations for administering their local retirement systems. It is therefore appropriate to look to that statutory scheme to determine the applicable rules governing the administration of the counties' retirement systems. And I see no provision in the 1937 enactment suggesting that the staff of retirement boards, which are independent entities vested with the authority to manage the retirement systems, would be treated as county employees. In the absence of any such provision, I do not see how the Legislature's decision to allow retirement boards to make their own staffing decisions can be said to have "interfered" with the counties' right to choose how they wanted to be governed. Again, the counties that are governed by CERL *chose to be governed by CERL.*

Notwithstanding that structure, the County *voluntarily* chose to establish a CERL-governed retirement system. If the County wanted to establish a type of pension plan that gave it greater control over the entities and employees that administer the plan, it could have done so, like many other counties chose to do. It is difficult to understand why constitutional provisions that are intended to "prevent state encroachment on counties' core powers" (maj. opn., *ante*, at p. 70) would have been understood to apply to a statutory scheme that was entirely voluntary.

Finally, the majority's assertion that it would likely be unconstitutional for a Legislature to unilaterally withdraw retirement system staff from home rule authority would seem to raise significant questions about the validity of various "legislative grants of authority to retirement boards." (*LACERA, supra,* 102 Cal.App.5th at p. 1216.) As explained above, some sections of CERL authorize retirement boards in specified counties to appoint executive retirement system personnel who are to "serve at the pleasure of, and may be dismissed at the will of, the appointing board or boards." (§ 31522.3, subd. (a); see 31522.4, subd. (a) [same]; dis. opn., *ante*, at pp. 21–22.) Such a delegation of authority would seem to stand in clear conflict with the home rule, which assigns counties the authority to determine the terms of their employees' " 'tenure' " (maj. opn., *ante*, at p. 3) and " 'the manner of their . . . removal' " (*id.*, at p. 42).**10**

---

**10**    The majority posits that despite impinging on county home rule authority, sections 31522.3 and 31522.4 may nonetheless be valid because the counties affected by those provisions "voluntar[ily] participat[ed]" in their enactment. (Maj. opn., *ante*, at p. 73; see *id.* at fn. 26.) The only authority

Although the validity of statutes like sections 31522.3 and 31522.4 are not at issue in this case, I am concerned that the majority's broad holding may substantially limit the Legislature's ability to regulate how much control retirement boards may exert over the very personnel that are appointed to administrate the retirement system.

### 2. Civil Service rules

The majority also suggests that assigning retirement boards classification and salary-setting authority would be incompatible with section 31552.1's directive that retirement personnel "shall be subject to the county civil service . . . rules." The majority does not, however, provide any explanation why that is so. The civil service rules require that the County Chief Executive Officer maintain a classification for "all positions" within the county, which includes a "schedule of compensation." (L.A. County Civil Service Rules, Rule 5.01(A), (B)(4).) But the civil service rules also provide detailed procedures that govern numerous other aspects of the employment relationship, including how candidates are recruited, selected, evaluated and disciplined. They likewise establish procedures that govern employee discrimination claims and the implementation of cuts to the work force.

I see no obvious reason why giving retirement boards the authority to fashion their own classifications and salary

the majority cites in support of that conclusion is legislative reports that lack any explicit statement of opposition from the affected counties (and in the instance of section 31522.3, *one* of the four affected counties was in favor of the measure). (See maj. opn., *ante*, at p. 73, fn. 26.) But the application of the home rule cannot turn on whether or not the statute in question was formally opposed by counties during the legislative process.

schedules would create a conflict with the civil service rules.
The two schemes can co-exist.  Under LACERA's interpretation,
the statute effectively imposes a ministerial duty on the counties
to adopt the retirement boards' classification requests, while
simultaneously requiring LACERA to provide retirement
system personnel with all of the procedural protections that the
civil service rules extend to county employees.

Indeed, it appears that is exactly what occurred during the
40-year period that preceded the current dispute.  As the County
explained in its 1996 opinion letter, while LACERA has
classification and salary setting authority, its "employees
[remain] subject to the County Civil Service System in the sense
that they have Civil Service protection and must be appointed
from eligible lists 'created in accordance with the civil service or
merit system rules of the county.' "  (1996 Opinion Letter,
*supra*.)  Under that shared understanding of the statutory
scheme, LACERA would prepare a memorandum for the board
of supervisors detailing the personnel changes.  (See dis. opn.,
*ante*, at p. 7.)  The memorandum would typically include a
classification and salary schedule drafted by LACERA staff.
The boards of supervisors would then adopt the classification
that LACERA had drafted into its salary ordinance, as required
under section 31522.1.  (See § 31522.1 ["The personnel . . . shall
be included in the salary ordinance or resolution adopted by the
board of supervisors for the compensation of county officers and
employees"].)  LACERA's relationship with its appointees, in
turn, was governed by the other procedures laid out in the civil
service rules.  The parties apparently had no issues operating
under that bifurcated approach during the four decades that
preceded this dispute.  That extensive history would seem to
belie any suggestion that assigning LACERA classification and

salary setting authority would create an irreconcilable conflict
with the civil service rules.

I also find it notable that the County has never argued
that giving retirement boards statutory authority to establish
classifications and set compensation levels for retirement
personnel would create an irreconcilable conflict with the civil
service rules.  Instead, the County's primary concern regarding
the civil service rules is that LACERA's proposed interpretation
of *Proposition 162* — i.e., that the proposition gives retirement
boards *constitutional* authority over all aspects of personnel
decisions — would cast doubt on the validity of section 31522.1's
requirement that retirement plan personnel are subject to the
civil service system.  (See maj. opn., *ante*, at p. 77 [LACERA's
assertion that Proposition 162 assigns retirement boards
" 'complete and absolute' authority over personnel decisions"
would effectively "nullify" and "override" section 31522.1's
directive that retirement personnel shall be subject to the civil
service rules].)  LACERA's statutory interpretation of *CERL*,
however, does not implicate any such concerns.  In my view,
interpreting CERL as assigning retirement boards the statutory
authority to establish new classifications is entirely compatible
with section 31522.1's requirement that the civil service rules
govern the terms of employment of persons who are ultimately
hired into those classifications.

### 3. *Subsequent legislation exempting some retirement system personnel from the civil service rules*

Looking beyond the text of section 31522.1, the majority
next argues that its interpretation is supported "to some degree"
(maj. opn., *ante*, at p. 65) by subsequent amendments to CERL
that exempted certain (in one case all) employees within four
retirement systems from the county civil service system.  Each

of those amendments included language stating that the specified personnel "may not be county employees but shall be employees of the retirement system."  (§ 31522.5, subd. (b); see § 31522.7, subd. (b) [same]; § 31522.11, subd. (b) [same]; see also § 31522.9, subd. (a).)   Some of the legislative materials accompanying these bills suggested that the amendments would, among other things, allow retirement boards to offer their employees' higher salaries.  (See maj. opn., *ante*, at p. 68.) The majority draws broad conclusions from these materials, arguing that they show that:  (1) the intent of the subsequent amendments was "to shift salary-setting power from counties to retirement boards" (*id*. at p. 70), which would have been unnecessary if retirement boards already had such authority under section 31522.1; and (2) the Legislature has always understood that "absent a specific exception, county governments have final authority over the classification and compensation of retirement board personnel" (maj. opn., *ante*, at p. 66).

There are multiple problems with this line of argument. First, the amendments the majority rely on were passed between 2002 and 2015, while sections 31522.1 and 31580.2 were enacted *in 1973*.  Unlike the majority, I am not persuaded that this series of amendments provide a "strong indication" (maj. opn., *ante*, at p. 70) of what the Legislature intended when it passed Assembly Bill 470 some *three decades* earlier (or when it first enacted CERL some seven decades earlier).  (See, e.g., *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244 ["there is little logic and some incongruity in the notion that one Legislature may speak authoritatively on the intent of an earlier Legislature's enactment when a gulf of decades separates the two bodies"]; *Peralta Community College Dist. v.*

*Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 52 ["The declaration of a later Legislature is of little weight in determining the relevant intent of the Legislature that enacted the law"].) The majority provides little explanation why actions taken by the Legislature in 2002 should inform our views as to the Legislature's intent was in 1973 or 1937.

Second, while the majority contends that these amendments "were specifically intended to shift control over compensation . . . from the counties to their retirement boards" (maj. opn., *ante*, at p. 67), their impact went far beyond the issue of compensation. Rather, the amendments removed certain retirement system personnel *from every aspect of county control,* including the civil service rules. Thus, the retirement boards were enabled to develop their own procedures regarding *all* elements of employment, including recruiting, hiring, discipline and termination. Thus, while the majority's analysis posits that the primary purpose of these subsequent amendments was to shift salary setting to the retirement boards, it appears that their true intent was to transform the retirement personnel of some retirement systems into at-will employees of the retirement board. I am not persuaded that the Legislature's decision to withdraw some retirement personnel in four specified counties from the civil service system and make them employees of the retirement system for all purposes shows that sections 31522.1 and 31580.2 were not intended to give retirement boards classification and salary-setting authority when those provisions were passed in 1973.

And even if we were to assume that the primary purpose of these amendments *was* to shift salary setting to the retirement boards, the majority overlooks the possibility that this may well have been done to remove any uncertainty as to

whether Assembly Bill 470 meant to convey such authority.  The legislative history of one of these newly added provisions — section 31522.9 — indicates that there was substantial uncertainty on that issue.  As detailed in the Court of Appeal's decisions, section 31522.9 was added to the Government Code after Contra Costa County got into a dispute with its retirement association (the CCCERA) regarding the county's authority to include CCCERA personnel in a memorandum of understanding (MOU) agreeing that all county employees would be furloughed. The legislative reports analyzing the bill stated that it was unclear whether the county had such authority because, " '[u]nder existing law, *the CCCERA Board has authority to establish compensation for retirement system employees*,' " but " 'the Board of Supervisors has responsibility to establish civil service rules and enter MOUs for all county employees.' " (*LACERA, supra*, 102 Cal.App.5th at p. 1226, quoting Sen. Public Employment and Retirement Com., Analysis of Sen. Bill No. 673 (2013–2014 Reg. Sess.) as amended Jan. 6, 2014, p. 3, italics added (Sen. Public Employment and Retirement Com. Bill Analysis); see Sen. 3d reading analysis of Sen. Bill No. 673 (2013–2014 Reg. Sess.), as amended Jan. 23, 2014, at p. 3; Assem. Com. on Public Employment, Retirement and Social Security, Analysis of Sen. Bill No. 673 (2013–2014 Reg. Sess.) as amended Jan. 23, 2014, p. 3.)  The parties settled the dispute by agreeing to jointly seek legislation making clear that retirement system staff were the employees of CCCERA for all purposes, which ultimately resulted in the adoption of section 31522.9.

This history conflicts with the majority's assertion that these subsequent amendments "consistently display an understanding [among the Legislature] that, absent a specific exception," counties retained final authority over salary setting.

(Maj. opn., *ante*, at p. 66.) Indeed, the legislative reports analyzing section 31522.9 make clear that there was no uniform understanding on that issue. Several of those reports specifically state that, under existing law (i.e., *before* the "specific exception" was passed), the *retirement board* had authority to establish compensation for retirement system employees.[11] (See dis. opn, *ante*, at p. 37.) And section 31522.9 was specifically intended to resolve a disagreement regarding whether a county had authority to take actions that affected the compensation of retirement system staff. Section 31522.9 removed any doubt as to that issue by making CCCERA personnel the employees of CCCERA for all purposes.

---

[11] The majority dismisses the relevance of this language by arguing that it appears in a section of the legislative report discussing "the *claims in a lawsuit* that ultimately gave rise to the legislation in question." (Maj. opn., *ante,* at p. 69, fn. 24.) But the statement in question was not describing *the claims that the parties had made in the lawsuit.* Instead, the statement was made as part of an explanation regarding how existing law had led to the parties' disagreement. More specifically, the legislative report explained that "[u]nder existing law, the CCCERA Board has authority to establish compensation for retirement system employees" while "the Board of Supervisors has responsibility to . . . enter MOUs for all county employees." (Sen. Public Employment and Retirement Com. Bill Analysis, *supra,* at p. 3; see dis. opn., *ante,* at p. 37.) The parties' dispute, in turn, centered not on whether CCCERA had authority to set compensation, but on whether the county was permitted to enter into an MOU that effectively reduced the salary of retirement system personnel in light of CCCERA's salary-setting authority. Thus, I read these reports not as discussing *claims* in a lawsuit, but as affirmatively informing legislators that one of the circumstances that led to the lawsuit was that *under existing law* the CCCERA had authority to establish compensation of retirement system staff.

The history of section 31522.9 and the current dispute between LACERA and the County both illustrate that there has been some level of uncertainty whether the 1973 amendments were intended to assign retirement boards the authority to set the salaries of retirement system personnel. That uncertainty is why we granted review in this case and why our court is divided on the issue. But the fact that the Legislature took steps to remove that uncertainty for some retirement system employees in no way indicates, as the majority suggests, that the majority's interpretation of section 31522.1 is the correct one.

### 4.  Interference with the "cooperative process"

The majority next turns to policy justifications, arguing that giving counties final authority over classification and salary setting would better "preserve[] the collaborative relationship" (maj. opn., *ante*, at p. 78) that CERL envisions "between retirement boards and [the counties] on issues related to employee classification and compensation" (maj. opn., *ante*, at p. 2). Citing an amicus curiae brief filed by the California State Association of Counties, the majority explains that "CERL creates a type of 'meet-and-confer process' in which 'the needs of both the retirement system and the county are taken into account.'" (*Id.* at p. 79.) According to the majority, the "long history of successful collaboration between LACERA and the County before the present dispute" demonstrates that this cooperative system " 'works well.' " (*Ibid.*) The majority tells us that interpreting CERL in a manner that allows the retirement boards to establish classifications and set salaries would "upset that balance by leaving these decisions to retirement boards alone." (Maj. opn., *ante*, at p. 2.)

I believe the majority has it backward. While warning us that LACERA's interpretation would threaten the "cooperative process" (maj. opn., *ante*, at p. 80) that CERL envisions, the majority overlooks a crucial fact: The parties' "long history of successful collaboration" (maj. opn., *ante*, at p. 79) occurred within an environment in which the County *expressly agreed* that the retirement boards "ha[d] only a ministerial role" in approving the classification and salary requests that LACERA submitted to it. (Beverly A. Campbell, Assistant Director of the County of Los Angeles Department of Human Resources, letter to Janice Golden, LACERA Personnel Officer, April 20, 1998.) I see no reason why we would expect that cooperation to end were we to simply confirm the reading of CERL that the parties had shared during their long-running period of successful collaboration. LACERA's counsel confirmed as much at oral argument, explaining that the retirement board anticipated that the parties would continue to collaborate on personnel decisions even if it was determined that LACERA ultimately had final say over those decisions, just as they did in the decades prior to their current dispute.

In the end, the County has made no showing that the parties' prior practice of allowing LACERA to create classifications and set salaries caused any serious problems between the parties. To the contrary, it appears that this practice resulted in a long-running collaboration that broke down only when the County abruptly changed course and asserted veto authority over personnel decisions. I find decades of a seemingly successful course of dealing far more persuasive than the majority's speculation about what might occur if we turned the parties' past practice on its head.

The majority likewise fails to account for the fact that CERL assigns counties a significant amount of control over a retirement board's initial decision to approve new classifications and salary ranges.  Under CERL, county appointees control a *majority* of the seats on the board of retirement, which must approve personnel changes before they are ever submitted to the boards of supervisors for inclusion in the salary ordinance.  Thus, any classification or salary change that reaches the board of supervisors has already been approved by an entity that is majority controlled by the county's own representatives.  To the extent CERL envisions a "cooperative process" (maj. opn., *ante*, at p. 80) between the retirement system and the county, it seems that such cooperation is reflected in the composition of the retirement board itself.  But under the majority's view, the county not only controls a majority of seats on the board that decides what classification and salary decisions are in the best interests of the retirement system, but it also retains authority to veto personnel decisions that were approved by that board.  How that outcome can possibly be said to preserve the "balance" (maj. opn., *ante*, at p. 2) that CERL envisions is unclear.

## 5. *Remedies*

Finally, the majority attempts to mitigate the consequences of its holding by clarifying that a county's decision to reject a personnel decision "remain[s] subject to judicial review for abuse of discretion" by way of a writ of mandate. (Maj. opn., *ante*, at p. 83.)  Under that view, the county's decision to reject a classification or salary request would control "if reasonable minds [could] disagree as to the wisdom of" its actions.  (*California Public Records Research, Inc. v. County of Stanislaus* (2016) 246 Cal.App.4th 1432, 1443; see *ibid*. ["[w]hen a court reviews a public entit[y's] decision for an abuse of

discretion, . . . [the decision must be upheld] if reasonable minds may disagree as to the wisdom of the public entity's discretionary determination"].)

Once again, I think the majority has it exactly backward. While I agree that writ proceedings may play a role when the "cooperative process" (maj. opn., *ante*, at p. 80) over retirement board personnel decisions breaks down, I believe it is *the counties* that should be required to seek such relief if they believe that a retirement board has made an unreasonable classification or salary decision.[12]  At its core, I view the

---

[12]  The majority questions whether the County would have standing to pursue such a claim, noting that "when asked about this possibility at oral argument," LACERA's counsel expressed doubt whether counties would have standing to seek writ relief "based on breach of fiduciary duty because LACERA owes a fiduciary duty to members, not the county." (Maj. opn., *ante*, at p. 84, fn. 30.)  While true that LACERA's counsel was skeptical that *the County* would have standing to bring claims against LACERA based on breach of fiduciary duties, he readily acknowledged that retirement system *members* would clearly have standing to do so (a position that nobody seems to dispute). Counsel also did not foreclose that, *separate and apart from a breach of fiduciary claim*, there "m[ight] be other ways the County could raise such a challenge."  It is not surprising that counsel was hesitant to provide a definitive answer given that "neither party . . . focused" on the question of remedies in their briefing.  (Maj. opn., *ante* at p. 82.)

In any event, I do not find it a "difficult task" (maj. opn., *ante*, at p. 84, fn. 30) to understand why the County would have standing to bring a mandamus action to challenge a retirement board's unreasonable personnel decisions.  A mandamus action "is proper where . . . the claim is that an agency has failed to act as required by law." (*California Assn. for Health Services at Home v. Dept. of Health Services* (2007) 148 Cal.App.4th 696, 705.)  As the majority acknowledges, Proposition 162 and the Government Code impose numerous duties on retirement

fundamental question in this case to be whether the Legislature
intended to give the retirement boards discretion to decide what
positions and salary ranges are necessary to properly
administer the retirement system or did it intend to assign that
discretion to the counties. Stated differently, whose views did
the Legislature intend to control when reasonable minds could
differ about the necessity of a personnel decision? Given that
CERL expressly vests retirement boards with the authority to
"manage[] . . . the retirement system" (§ 31520), to "appoint"
such personnel as are necessary to administer the system (§
31522.1) and to adopt an annual operating budget that is to be
paid from the system's assets (§ 31580.2), I believe that the
Legislature intended that discretion to lie with the retirement
boards. For a span of nearly 40 years, the County and LACERA
both agreed with that conclusion.

But under today's ruling, that discretion now resides
squarely with the board of supervisors. In so holding, the
majority has effectively created a system under which a public

---

boards, including that they use pension funds to defray only the
"reasonable expenses of administering the system." (Cal.
Const., art. XVI, § 17, subds. (a), (b); see maj. opn., *ante*, at pp. 8–
9; 20–22.) Presumably, an unnecessary or wasteful personnel
expenditure would constitute a violation of those duties and
thus be challengeable in mandamus. And given that counties
make substantial capital contributions to maintain the solvency
of pension plans, they would have a clear "beneficial interest" in
ensuring that retirement funds do not waste those funds.
(*People for Ethical Operation of Prosecutors etc. v. Spitzer* (2020)
53 Cal.App.5th 391, 396, see *id.* at p. 407 [test of standing in
mandamus is whether the party is " 'beneficially interested' "];
*Board of Retirement v. Santa Barbara County Grand Jury*
(1997) 58 Cal.App.4th 1185, 1191 [retirement boards "run the
pension system . . . using substantial county funds"].)

entity charged with the management of in excess of $70 billion in assets — the largest county pension system in the country — must obtain permission from a separate political body (with interests that may not always align with the interests of the pension members) before creating a new position or giving its employees a raise.  The counties, in turn, now have license to veto personnel requests that a retirement board, acting in its capacity as a fiduciary, previously determined to be in the best interests of its membership.

I remain hopeful that counties will take seriously the majority's directive that they must "give due weight" to a retirement board's personnel requests and collaborate on such issues in "good faith."  (Maj. opn., *ante,* at p. 84.)  And while I appreciate the majority's acknowledgment that a retirement board may judicially challenge "not only the *merits* of a county's classification or compensation decision but also the *process* by which that decision was reached" (*id.* at p. 83), I do not believe that was the system that the Legislature envisioned when it enacted sections 31522.1 and 31580.2.  In my view, it seems far more reasonable to conclude that is exactly the outcome that the Legislature intended to avoid.  I therefore dissent.

**GROBAN, J.**

**We Concur:**

**LIU, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Los Angeles County Employees Retirement Association v. County of Los Angeles

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 102 Cal.App.5th 1167
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S286264
**Date Filed:** August 3, 2026

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** James C. Chalfant

_____

**Counsel:**

Latham & Watkins, Manuel A. Abascal, Nicholas Rosellini, Roman Martinez and Uriel Hinberg for Plaintiff and Appellant.

Hanson Bridgett, Raymond F. Lynch, Judith W. Boyette and Matthew J. Peck for Board of Retirement of the San Bernardino County Employees' Retirement Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Benedon & Serlin, Judith E. Posner, Gerald M. Serlin, Wendy S. Albers; Rothner, Segall & Greenstone, Julia Harumi Mass and Laura Carver for the Coalition of County Unions and the Service Employees International Union Local 721 as Amici Curiae on behalf of Plaintiff and Appellant.

Law Office of Michael A. Conger and Michael A. Conger for Retired Employees of Los Angeles County and California Retired County

Employees Association as Amici Curiae on behalf of Plaintiff and Appellant.

Reed Smith, Maytak Chin, Kathryn M. Bayes; Saltzman & Johnson Law Corporation, Russell Richeda; and Johnny Tran for the Boards of Administration for the San José Police and Fire Department Retirement Plan, the Federated City Employees' Retirement System, the Retirement Boards of the City of Fresno Employees Retirement System, the City of Fresno Fire & Police Retirement System and the Board of Administration for the San Diego City Employees' Retirement System as Amici Curiae on behalf of Plaintiff and Appellant.

Jeff Rieger for the Boards of Retirement of Alameda County Employees' Retirement Association, San Diego County Employees Retirement Association, Ventura County Employees' Retirement Association, Sonoma County Employees' Retirement Association, Imperial County Employees' Retirement System, San Mateo County Employees' Retirement Association, Sacramento County Employees' Retirement System, Santa Barbara County Employees' Retirement System, San Bernardino County Employees' Retirement Association, San Joaquin County Employees' Retirement Association, Stanislaus County Employees' Retirement Association, Mendocino County Employees Retirement Association, Marin County Employees' Retirement Association and Orange County Employees Retirement System as Amici Curiae on behalf of Plaintiff and Appellant.

Bernstein Litowitz Berger & Grossmann, Anya Freedman; Deutsch Hunt and Alexandra Mansbach for the National Conference on Public Employee Retirement Systems as Amicus Curiae on behalf of Plaintiff and Appellant.

Groom Law Group, Kelly A. Geloneck, Samuel I. Levin and David N. Levine for the Los Angeles Water and Power Employees' Retirement Plan, the Los Angeles City Employees' Retirement System and the San Francisco City and County Employees' Retirement System as Amici Curiae on behalf of Plaintiff and Appellant.

Renne Public Law Group, Ryan P. McGinley-Stempel, Linda M. Ross and Steve Cikes for Defendants and Respondents.

Jennifer Bacon Henning for California State Association of Counties as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Roman Martinez
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-3377

Ryan P. McGinley-Stempel
Renne Public Law Group
350 Sansome Street, Suite 300
San Francisco, CA 94104
(415) 848-7250